1999-NMCA-015

973 P.2d 871

**Ruth A. BENNETT, Robert Bennett, and J. Henry Gustafson, Petitioners–Appellees,**

v.

**The CITY COUNCIL FOR the CITY OF LAS CRUCES, New Mexico, and Gary Krivokapich, Respondents–Appellants.**

**No. 18478.**

Court of Appeals of New Mexico.

Dec. 21, 1998.

Neil E. Weinbrenner, Law Offices of Neil E. Weinbrenner, P.A., Las Cruces, for Appellees.

Harry S. "Pete" Connelly, Las Cruces, for Appellant City of Las Cruces.

Joseph Cervantes, Cervantes Law Firm, Las Cruces, for Appellant Krivokapich.

## OPINION

WECHSLER, Judge.

{1}  The City of Las Cruces and Gary Krivokapich appeal the district court's reversal of a decision by the Las Cruces City Council (Council) to change the zoning of property owned by the Krivokapich family from high-density residential to commercial with conditions.  They argue that the district court improperly took additional evidence regarding the rezoning request and that the Council's rezoning did not constitute illegal spot zoning as the district court found.  We agree with these arguments and reverse the decision of the district court.

*Factual and Procedural Background*

{2} Gary Krivokapich, together with and on behalf of his parents, Bosco and Annie Jo Krivokapich, applied to the City for a zoning change from R–3 (high-density residential) to C–2c (general commercial with conditions) of a 4.2–acre unimproved parcel (Parcel) owned by Bosco and Annie Jo Krivokapich. C–2 zoning generally would permit commercial/retail uses which generate large volumes of automobile traffic, such as convenience stores and service facilities. The Parcel is located on the northeast corner of El Paseo Avenue and Farney Lane in Las Cruces.

{3} The Las Cruces Planning and Zoning Commission (Zoning Commission) held a hearing on June 28, 1994 and heard testimony from various people. Bosco and Gary Krivokapich spoke about plans to develop a small, commercial center subject to numerous restrictive conditions. Bill Webber, an attorney representing the Crescent Park area residents' group, spoke against the change indicating he believed it constituted spot zoning. Ruth Bennett, a neighbor in the Crescent Park Subdivision, and Henry Gustafson, owner of property across the street from the Parcel, also spoke against the proposed change. David Weir, a senior planner for the City, summarized a report prepared by the Las Cruces Planning Department recommending against the change and indicating that the department thought the change would be considered spot zoning. Based upon the testimony and the planning department report, the Zoning Commission voted against the proposed change. The Zoning Commission only has the authority to make recommendations to the Council.

{4} The Council scheduled a hearing on the issue for its September 19, 1994 meeting. It mailed notice to nearby property owners and published notice in the *Las Cruces Sun News.* At the September 19, 1994 meeting, the Council tabled the issue until its next scheduled meeting two weeks later. Ruth Bennett and Henry Gustafson attended the September 19, 1994 meeting. When the Council subsequently heard the issue at its October 3, 1994 meeting, it had before it a copy of the proposed rezoning ordinance, an appeal letter from the Krivokapich family with photographs of the surrounding area, the planning department report, many protest letters, and the minutes of the June 28, 1994 Zoning Commission meeting.

{5} When Mayor Ruben Smith called the matter for discussion at the October 3, 1994 meeting, he limited, without objection, the length of testimony from witnesses to approximately ten minutes each. The Council then heard testimony from several individuals, beginning with Gary Krivokapich. Bill Webber spoke against the development on behalf of the Crescent Park area residents' group. Community member Reed Larsen voiced his protest, as did Diana Mervine, representative of the Mesilla Valley Christian Church, an adjacent property owner. Gary Krivokapich, Webber, and members of the planning department fielded questions from the council members. The Council approved the zoning change from R–3 to C–2c.

{6} Ruth and Robert Bennett and Henry Gustafson subsequently applied for a writ of certiorari to the district court, and also filed a complaint for declaratory judgment contending that: (1) the Council's decision to rezone the Parcel was impermissible spot zoning; (2) notice of the City Council hearing was insufficient; and (3) the Council violated due process by limiting testimony to ten minutes each. The district court granted the writ, took additional testimony, and held for petitioners on each issue. This appeal followed.

*The Council Provided Adequate Notice*

{7} The district court found that the Council failed to give proper notice of the hearing to Gustafson in violation of NMSA 1978, § 3–21–6(B) (1981) or the City Zoning Code. We do not agree. Our Supreme Court has held that "substantial compliance" with notice and publication is sufficient to satisfy statutory requirements. *See Nesbit v. City of Albuquerque,* 91 N.M. 455, 457, 575 P.2d 1340, 1342 (1977) (stating that while "some courts have held that even a minor defect in notice will invalidate an action taken by the zoning authority, New Mexico does not take such a strict view"); *see also Hawthorne v. City of Santa Fe,* 88 N.M. 123, 124, 537 P.2d 1385, 1386 (1975).

{8} In *Hawthorne*, the city failed to mail notice to one adjacent property owner, but had mailed notice to all others and also had published notice. *See id.* at 123–24, 537 P.2d at 1385–86. The adjacent property owner had actual notice of the public hearing. *See id.* at 124, 537 P.2d at 1386. The Court rejected the argument that "failure to give notice in strict compliance" with an earlier version of Section 3–21–6 was error, stating that despite failure to mail notice to the adjacent property owner, the property owner was fully aware of the proposed zone changes. *Id.* The Court reasoned that the purpose of notice "is to apprise interested parties of the hearing so that they may attend and state their views on [a] proposed zoning amendment, pro or con." *Id.* Since the affected property owner in *Hawthorne* had actual knowledge of the hearing, the Court held that the city had substantially complied with notice provisions of the statute. *See id.*

{9} In the present case, it is undisputed that the Council published notice of the proposed zoning ordinance in the *Las Cruces Sun News* on September 4, 1994 for the September 19, 1994 meeting. It is also undisputed that the Council mailed notice to Gustafson in accordance with both Section 3–21–6 and the City Zoning Code. At the Council meeting on September 19, 1994, Mayor Smith called the issue out of order. After brief discussion, the issue was tabled, and Mayor Smith announced that the issue "will be heard in two weeks, it will not be heard this evening." At the very least, the Mayor's announcement constitutes substantial compliance with notice requirements in accordance with *Hawthorne* because actual notice was given to affected property owners.

{10} Gustafson contends that since he was not present at the Council meeting at the time Mayor Smith announced that the issue would be heard in two weeks, he did not receive notice in violation of the statute. However, this Court has held in similar situations that "where circumstances are such that a reasonably prudent person should make inquiries, that person is charged with knowledge of the facts reasonable inquiry would have revealed." *Bogan v. Sandoval*

*County Planning & Zoning Comm'n,* 119 N.M. 334, 341, 890 P.2d 395, 402 (Ct.App. 1994).

{11} It is undisputed that Gustafson arrived late to the Council meeting and inquired of other attendees as to the status of the issue. Upon hearing that the issue would not be heard that evening, Gustafson left. Gustafson indicated that he had previous experience attending council meetings, and based upon that experience, he arrived at what he thought would be the appropriate time to hear the issue. He admitted that it would have been of interest to him to know whether the issue was tabled and when it would be reheard, but that he did not make any further inquiry of the Council or City as to the status of the issue.

{12} Based upon the testimony and the fact that the Council provided actual notice, it was incumbent upon Gustafson to inquire of the City as to the status of the proposed ordinance. Once arriving and learning that the issue would not be heard that night, a reasonably prudent person with experience in attending city council meetings should have inquired of city representatives as to the status. *See Bogan,* 119 N.M. at 341, 890 P.2d at 402. As a result, we hold that the Council provided adequate notice.

*The Council Had Authority to Impose Time Restrictions*

{13} Gary Krivokapich and the City argue that the district court improperly found that Plaintiffs' due process rights were violated because of time limitations placed upon all attendees. The district court took additional testimony because it found "[t]hat because of the unreasonable limitations placed on Petitioners/Plaintiffs by the City Council in presentation of their position, [additional] testimony is necessary for a proper disposition of the matter."

{14} We cannot agree with the district court's conclusion. The record states that "Mayor Smith said they are trying to keep each side to approximately 10 minutes in their presentation and ... both [sides] consented to do that." Plaintiffs made no objections about the time limits when first proposed by Mayor Smith, or at any time during

the meeting. More importantly, there is nothing in the record to indicate that the Council thwarted any opponent or proponent from fully stating his or her views or told anyone to stop speaking because of the time constraints.

{15} Section 3–21–6(B) requires a public hearing and opportunity to be heard. It is within the Council's authority to restrict testimony fairly on both sides, provided that each party has an opportunity to be heard in accordance with Section 3–21–6 and any local rules. *See State ex rel. Battershell v. City of Albuquerque,* 108 N.M. 658, 661, 777 P.2d 386, 389 (Ct.App.1989); 8A Eugene McQuillin, *The Law of Municipal Corporations* § 25.263, at 353 (Julie Rozwadowski & James Solheim eds., rev.3d ed.1994). Other jurisdictions have upheld time restrictions as within a municipal government's authority. *See Smith v. City of Little Rock,* 279 Ark. 4, 648 S.W.2d 454, 457 (1983) (ten-minute time limit for presentation before city council not arbitrary in a rezoning action from single family to general commercial when city planning commission had held other public meetings and provided information and report to council); *Washington County Taxpayers Ass'n v. Board of County Comm'rs,* 269 Md. 454, 306 A.2d 539, 544 (1973) (in adoption of a comprehensive zoning ordinance, limits on time for oral presentation before planning commission valid when parties could also submit written testimony); *City of Jackson v. Cunningham,* 253 So.2d 385, 386 (Miss. 1971) (fifteen-minute time limit for presentation to city council not a failure to grant a full and complete hearing when council also had transcript of zoning board meeting for a rezoning ordinance); *Freeland v. Orange County,* 273 N.C. 452, 160 S.E.2d 282, 284, 286 (1968) (claim that comprehensive zoning ordinance was not legally adopted because county commissioners limited testimony to one hour on each side, followed by fifteen minutes of rebuttal; court held that while a public hearing was required by statute, county commissioners could prescribe an orderly procedure to allow parties to be heard).

{16} Here, the Council heard from everyone who chose to speak at the October 3, 1994 meeting. The Council also had the full report of the Zoning Commission which included letters from various citizens, minutes of the Zoning Commission's June 28, 1994 hearing, and the planning department report. Gustafson and Ruth Bennett both gave statements at the June 28, 1994 hearing. The Council's imposition of impartial time limits was therefore reasonable and did not violate Plaintiffs' due process rights when coupled with the fact that all parties in attendance who wanted to make statements did so and that the Council had the record of statements both for and against the proposed zoning change from the Zoning Commission hearing.

*The Rezoning Ordinance Did Not Constitute Impermissible Spot Zoning*

{17} Gary Krivokapich and the City challenge the district court's finding that the Council's rezoning of the Parcel from R–3 to C–2c was illegal spot zoning, resulting in the court's finding that the Council's actions were arbitrary, capricious, and erroneous. Our Supreme Court adopted the following definition of spot zoning in *City of Albuquerque v. Paradise Hills Special Zoning District Commission,* 99 N.M. 630, 632, 661 P.2d 1329, 1331 (1983) (quoting 101A C.J.S. *Zoning & Land Planning* § 44, at 161 (1979) (footnotes omitted)):

"Spot zoning is an attempt to wrench a single lot from its environment and give it a new rating that disturbs the tenor of the neighborhood, and which affects only the use of a particular piece of property or a small group of adjoining properties and is not related to the general plan for the community as a whole, but is primarily for the private interest of the owner of the property so zoned."

{18} In the leading New Mexico case on spot zoning, *Watson v. Town Council of Bernalillo,* 111 N.M. 374, 378, 805 P.2d 641, 645 (Ct.App.1991), this Court stated "[s]pot zoning is determined on an ad hoc basis, depending on the facts and circumstances of each case." The *Watson* Court elaborated on the definition above, stating:

"The term 'spot zoning' refers to the rezoning of a small parcel of land to permit a use [that] fails to comply with a comprehensive plan or is inconsistent with the

surrounding area, grants a discriminatory benefit to the parcel owner, and/or harms neighboring properties or the community welfare."

*Id.* (quoting 2 Edward H. Ziegler, Jr., *Rathkopf's The Law of Zoning and Planning* § 28.01, at 28–1 to 28–2 (Rev.1990)). In *Watson,* this Court applied this definition of spot zoning to determine whether the Town of Bernalillo's rezoning of newly-annexed property from agricultural and residential use to industrial use constituted spot zoning. We examined: (1) the disharmony with the surrounding area; (2) the size of the area rezoned; and (3) the benefit of the rezoning to the community or the owner of the parcel to determine whether spot zoning occurred. *See Watson,* 111 N.M. at 378, 805 P.2d at 645. After concluding that these factors did not support a finding of impermissible spot zoning, we also viewed the change in accordance with documents that were found to comprise the comprehensive plan. *See id.* at 380, 805 P.2d at 647.

{19} In *Watson,* the facts that the surrounding area was "largely vacant or in agricultural use" and that the property was better "suited for industrial rather than residential use" supported the zoning change. *Id.* at 378–79, 805 P.2d at 645–46. The large size (sixty-eight acres) of the tract leaned "in favor of a finding against spot zoning." *Id.* at 378, 805 P.2d at 645. This Court also found that the intent of the rezoning to allow construction of a gypsum plant was "done for the benefit of the community" because it would employ up to eighty-seven people from the local community and would comprise nearly 25% of the town's tax revenues, and because the company would provide a scholarship program, student summer employment, and develop a park. *Id.* at 379, 805 P.2d at 646. We stated that examination of these factors led us to conclude that substantial evidence supported the district court's conclusion of no spot zoning. When we examined the rezoning in light of the comprehensive plan, we held that the documents comprising the plan supported the development of local employment opportunities and the use of annexed land and land near Interstate 25 for such a purpose. *See id.* at 380–81, 805 P.2d at 647–

48. We thus concluded that the Town of Bernalillo's rezoning did not constitute spot zoning. *See id.* at 382, 805 P.2d at 649.

{20} Since spot zoning is dependant upon the facts and circumstances of each case, we examine the above factors as we did in *Watson.* In accordance with our standard of review, we look at the whole record to determine whether there is substantial evidence to support the Council's zoning change and whether the change constituted impermissible spot zoning. *See id.* at 376, 805 P.2d at 643. We are mindful that " '[n]o proposition of zoning law is better settled than that a municipality has the right to amend its zoning ordinance where the amendment is reasonable and follows the procedure prescribed by the enabling legislation.' " *Id.* at 377, 805 P.2d at 644 (quoting 2 E.C. Yokley, *Zoning Law and Practice* § 11–3, at 93 (4th ed.1978)).

A. *Examination of the Surrounding Area, Size of the Parcel, and Benefit of the Zoning Change*

1. *Disharmony with the Surrounding Area*

{21} The Parcel, located near New Mexico State University (NMSU), is unimproved—having one unoccupied house. The land immediately to the east and adjacent to the Parcel is zoned R–3, but is used as a park and flood plain, and the adjacent land to the north is zoned R–3, but has special use permits for a church and affiliated school. The land to the south across Farney Lane is also zoned R–3, but is vacant and used for agriculture. The property to the west and across El Paseo Avenue is zoned R–1 (single family residential) and contains over 200 homes.

{22} While the planning department indicated in its report that the change in zoning could constitute spot zoning, it examined the proposed change in conjunction with only the four immediately adjacent or closest properties. We do not take such a limited review. When examining a charge of spot zoning, courts look not only at the zoning of the immediately adjacent properties, but also

to the surrounding area. As the Pennsylvania Supreme Court noted in *Schubach v. Silver,* 461 Pa. 366, 336 A.2d 328, 337 n. 16 (1975):

> [A] reviewing court cannot take too constrained a view of the surrounding neighborhood. To discuss a zoning measure by merely looking at the nature of the particular city block on which the rezoned land is located, is simply incorrect. Although the court must focus its attention on the immediately surrounding land ... we are mindful that in this immediate area there is an industrial tract, multi-family apartment structures and shopping areas.

*See also England v. Mayor & Council of Rockville,* 230 Md. 43, 185 A.2d 378, 379 (1962) (in spot zoning case, court examined whole block and next block, plus adjacent properties); *Hedin v. Board of County Comm'rs,* 209 Md. 224, 120 A.2d 663, 665 (1956) (in finding no spot zoning, court considered the surrounding greater neighborhood and various developments); *Wright v. Mayor & Comm'rs of Jackson,* 421 So.2d 1219, 1223 (Miss.1982) (in finding spot zoning, court examined, among other factors, character of entire neighborhood and location of interstate); *Clawson v. Harborcreek Township Zoning Hearing Bd.,* 9 Pa. Cmwlth. 124, 304 A.2d 184, 187 (1973) (court examined adjacent area, as well as two miles surrounding area); *see generally* 1 *Anderson's American Law of Zoning* § 5.16, at 417 (Kenneth H. Young ed., 4th ed.1996).

{23} When we examine the zoning of the surrounding area, the record reflects a variety of mixed uses as well as the proximity of a major university. The west side of El Paseo Avenue from Las Cruces High School to NMSU is primarily residential. The surrounding block to the north and east bordered by El Paseo Avenue, Farney Lane, Boutz Road, and Espina Road is mixed use with a combination of residential and commercial zoning. Espina Road is largely C–2 with such businesses as a car wash, fast food, small retail shopping center, gas station, and warehouses. The section on Boutz Road is mostly R–3, however land on El Paseo Avenue just north of Boutz Road is largely commercial. The City had designated NMSU-owned land on the corner of Boutz Road and El Paseo Avenue as C–2c. This land was zoned R–3, with a change to C–2c if the land were developed within two years. Since NMSU did not develop the land within the allotted time frame, it is apparently R–3 again, but still shown on city records as C–2c.

{24} El Paseo Avenue leads directly to NMSU. The planning department report indicated that the City's major thoroughfare plan considers El Paseo Avenue to be a major arterial. The traffic engineering department stated in the planning department report that an increase in the volume of traffic on El Paseo Avenue and adjacent streets would not be a problem because the "area does not have considerable traffic capacity problems at the present time." The report suggested possibly acquiring a right-of-way from the developer on Farney Lane to ease any potential traffic congestion. *See Hedin,* 120 A.2d at 665 (taking width of roads into consideration); *Schubach,* 336 A.2d at 336 (noting that property was situated near two heavily traveled arteries).

{25} In this case, while the immediately adjacent properties are zoned single-family and high-density residential, the surrounding area is not uniformly residential; as described above, it consists of a mixture of residential and commercial uses. Consequently, the Council could reasonably conclude that there would be no disharmony with the surrounding area resulting from the zoning change that would create an "island" in an otherwise uniformly-zoned area. *See St. Vladimir's Ukranian Orthodox Church v. Fun Bun, Inc.,* 3 Pa.Cmwlth. 394, 283 A.2d 308, 309–311 (1971) (finding no spot zoning where the lot was situated near other properties already being used for non-residential purposes, and across the street and in the general area there were existing commercial zones); *cf. Schubach,* 336 A.2d at 338–39 (finding no spot zoning when surrounding area was in transition and had mixed uses, and property ill-suited for residential use).

2. *Size*

■■ {26} The smaller the property being rezoned, the more likely the finding of

spot zoning; while the larger the tract, the less inclined courts are to find spot zoning. *See Watson,* 111 N.M. at 379, 805 P.2d at 646; 1 *Anderson's American Law of Zoning, supra,* § 5.15, at 412, 414. Size is often the most important factor, but not the only one in determining spot zoning. *See Fifteen Fifty N. State Bldg. Corp. v. City of Chicago,* 15 Ill.2d 408, 155 N.E.2d 97, 102 (1958) (inconsistent rezoning of small parcels discouraged, but not "every reclassification of a single tract is void *ipso facto* "). Cases finding impermissive spot zoning have overwhelmingly involved parcels small in size, but many of these cases also involved the rezoning of a residential lot within a uniformly residential neighborhood. *See Friedland v. City of Hollywood,* 130 So.2d 306, 308 (Fla.Dist.Ct.App. 1961) (rezoning two adjacent lots in residential neighborhood to allow a gas station found to be spot zoning); *Hunt v. City of San Antonio,* 462 S.W.2d 536, 540 (Tex.1971) (rezoning two adjacent lots spot zoning in residential neighborhood); *see also* 1 *Anderson's American Law of Zoning, supra,* § 5.15, at 413 n. 19. In the case on appeal, the relatively small parcel size, 4.2 acres, favors a finding of spot zoning, but is not a conclusive finding of impermissible spot zoning. It is not the rezoning of a single lot in a residential neighborhood. We view the small size of the parcel in conjunction with other existing factors. *See Town of Marblehead v. Rosenthal,* 316 Mass. 124, 55 N.E.2d 13, 14 (1944) ("The invalidity of 'spot [z]oning' depends upon more than the size of the 'spot.' "); *see also* 1 *Anderson's American Law of Zoning, supra,* § 5.15, at 416–17.

### 3. *Benefit to the Community or the Owner*

{27} We next examine whether the rezoning primarily benefits the property owner or the community. Gary Krivokapich presented evidence that the proposed commercial center would create up to forty-two jobs and increase the community's tax base. The Council also recognized that if it approved the rezoning, it would attach additional conditions on development relating size, height, use, and landscaping that would result in a more attractive commercial center which would be beneficial to the community.

{28} Gary Krivokapich also presented as evidence the result of an informal survey his family conducted of the 225 nearest residences. The survey revealed that a majority of neighbors would prefer a quality commercial development rather than apartments designed for low-income residents or college students, as permitted by the present zoning, and that some neighbors would prefer neither. Opponents of the rezoning stated that the survey was biased and that the City needed upscale apartments which could be developed on that property. Given this evidence, while this zoning change may not benefit the community to the same extent as the change in *Watson,* the Council could nonetheless reasonably conclude that some benefit would accrue to the surrounding community and not just to the property owners. *Cf. Lee v. District of Columbia Zoning Comm'n,* 411 A.2d 635, 641 (D.C.1980) (finding that zoning decision is spot zoning if inconsistent with comprehensive plan and benefits only owner of the land as opposed to the general public); *Jackson & Perkins Co. v. Martin,* 12 N.Y.2d 1082, 240 N.Y.S.2d 29, 190 N.E.2d 422, 422 (1963) (finding that ordinance which solely benefitted mobile home courts to detriment of owners of adjacent land, and adopted not in accordance with comprehensive plan is spot zoning).

{29} We cannot conclude after examining the above factors that the Council's rezoning of the Parcel from R–3 to C–2c constituted impermissible spot zoning. However, we must also analyze whether the rezoning violates the comprehensive plan, thereby supporting the district court's finding of spot zoning.

### B. *Comprehensive Plan*

{30} As stated above, spot zoning may also occur "if the use fails to comply with the comprehensive plan." *Watson,* 111 N.M. at 378, 805 P.2d at 645. Conformity with the comprehensive plan is an indication that the intent of the rezoning has potential benefits beyond just the property owner. In examining the rezoning in light of the comprehensive plan, we also are mindful of the above discussion concerning the benefit to

the community of the zoning change as an indicator of compliance with the comprehensive plan.

{31} The City adopted a comprehensive plan which encourages a well-balanced array of attractive and convenient commercial uses in Las Cruces. The comprehensive plan discourages "dispersed, leapfrog development," but, at the same time, encourages infill development. City of Las Cruces Comprehensive Plan, Resolution No. 86–096, 2.0, at 6 (Nov. 18, 1985). The comprehensive plan addresses commercial developments, stating that it encourages "planned nodes or centers in all new commercial development and ... discourage[s] further strip commercial development," *id.* 7.7, at 15, while also stating that in "areas previously planned, where a recognizable transition in use is occurring, ... [t]he City will encourage office, retail and/or mixed use infill development within the downtown area, and south of Boutz Road west of El Paseo in order to strengthen and enhance this part of the City as a vibrant center of activity," *id.* 3.1, at 20.

{32} In examining the intent and language of the comprehensive plan, we do not view the plan in isolation from other city actions. We also look at the University Avenue Corridor Plan, statements made by the Council at the October 3, 1994 meeting, *cf. High Ridge Hinkle Joint Venture v. City of Albuquerque,* 119 N.M. 29, 41, 888 P.2d 475, 487 (Ct.App.1994) (Court quoted statement made by councilor at city council meeting in zoning case), and previous zoning decisions by the Council to aid this Court in determining whether the rezoning of the Parcel comports with the Comprehensive Plan.

{33} The Parcel is located south of Boutz Road, on the east side of El Paseo Avenue. The land in the surrounding area is a variety of commercial and residential uses. Even some of the adjacent residentially-zoned properties are being used for a variety of special uses. Thus there appears to be a "recognizable transition in use." Significantly, as we have noted, the City previously changed the zoning designation of the NMSU-owned land from R–3 to C–2. This land is also located on the east side of El

Paseo Avenue several parcels north of the Parcel.

{34} Las Cruces adopted a University Avenue Corridor Plan, which pertains to the area north of the NMSU campus which does not include the Parcel. The University Avenue Corridor Plan, however, encourages creation of an attractive gateway to NMSU. The Parcel is part of the gateway on the opposite side of the University Avenue Corridor Plan. Councilor Gene Kennon stated at the October 3, 1994 council meeting that "the whole intent of the University Avenue Corridor Plan was to upgrade anything that was taking place while we still had a chance. And the standards there put the emphasis on architecture, landscaping and signage. And the standards are higher than they are for the rest of the city." The proposed commercial development voluntarily conforms to the University Avenue Corridor Plan with its landscaping, architecture, and signage. In supporting the rezoning, Councilor Kennon further stated at the meeting that it is "incumbent upon us to consider the overall image of the city and the standards that we want to set." *See Planning & Design Solutions v. City of Santa Fe,* 118 N.M. 707, 709, 711, 885 P.2d 628, 630, 632 (1994) (relying on statements of city councilors at council meeting as evidence of improperly awarding contract); *High Ridge Hinkle Joint Venture,* 119 N.M. at 41, 888 P.2d at 487. Councilor Herculano Ferralez called attention to the fact that El Paseo Avenue is a large street with a high density of traffic and would be a buffer between a commercial center and the single-family residential homes in the area. Additionally, the planning department report stated that El Paseo Avenue is a major traffic arterial, designed to handle commercial traffic.

{35} In sum, the whole record supports the Council's determination that this rezoning would be consistent with the purpose and the text of the comprehensive plan. Considering the right of a municipality to amend its zoning ordinance, *see Watson,* 111 N.M. at 377, 805 P.2d at 644, and the intent and goals of the comprehensive plan, we see no basis for a court to second-guess the Council's rezoning decision as arbitrary, capricious, or

contrary to the law. The rezoning fulfills the Council's goals of infill development and other features found in the comprehensive plan and also meets the Council's goal of creating an attractive gateway to NMSU. *See id.* at 379, 805 P.2d at 646. It comports with the City's prior action regarding the NMSU property.

{36} This conclusion, in turn, reflects a benefit to the community as a whole ranging beyond the more narrow interests of either the property owner or the immediate neighbors. Impermissible spot zoning necessarily implies official action that has no support in the record of a broader benefit to the community. Spot zoning is impermissible precisely because its benefits primarily accrue only to the narrow, private interests of the property owner. The record does not support such a conclusion in this case. As a result, we conclude that the Council complied with the comprehensive plan and did not impermissibly spot zone the Parcel.

*Conclusion*

{37} Based upon the record before the Council, we conclude that the district court erred in finding that notice was inadequate and that time restrictions were improper, and that the rezoning of the Parcel constituted spot zoning. Therefore, we reverse the decision of the district court and uphold the rezoning ordinance as approved by the Council.

{38} **IT IS SO ORDERED.**

BOSSON and ARMIJO, JJ., concur.