2002-NMCA-075

50 P.3d 182

WEST BLUFF NEIGHBORHOOD ASSO-CIATION, Grande Heights Neighborhood Association, and West Area Residents for Aesthetic and Responsible Expansion, New Mexico corporations, Petitioners–Appellants,

v.

CITY OF ALBUQUERQUE, a municipal corporation, Respondent–Appellee,

and

Geltmore, Inc., a New Mexico corporation, Interested Party,

Wal–Mart Stores East, Inc.; Coors Limited, RRG; Richard B. Saylor; Susan J. Scarborough Saylor; Maureen Repetto, Trustee of the Maureen Repetto Revocable Living Trust; Susan Fayette Hutchinson, Co–Executor of the Estate of Barbara Novak; Dennis Novak, Co–Executor of the Estate of Barbara Novak; and Home Depot, Inc., Intervenors.

No. 21,743.

Court of Appeals of New Mexico.

May 15, 2002.

Certiorari Denied, No. 27,553, July 9, 2002.

Ann Berkley Rodgers, Peter C. Chestnut, Charles G. Berry, Charles G. Berry & Assoc., PA, Albuquerque, NM, for Appellants.

Robert M. White, City Attorney, David Suffling, Assistant City Attorney, Albuquerque, NM, for Appellee.

Victor R. Marshall, L. Helen Bennett, Victor R. Marshall & Associates, P.C., Albuquerque, NM, for Interested Party, Geltmore, Inc.

Richard Leverick, Leverick and Musselman, LLC, Albuquerque, NM, for Intervenor, Wal–Mart Stores East, Inc.

Catherine F. Davis, Julie J. Vargas, Hunt & Davis, P.C., Albuquerque, NM, for Intervenor, Home Depot, Inc.

*OPINION*

BOSSON, Chief Judge.

{1} Three Albuquerque neighborhood associations (referred to collectively as West Bluff) oppose a retail shopping center in their neighborhood. The site development plan for the shopping center was approved by the City of Albuquerque and subsequently affirmed by the district court. This Court granted West Bluff's petition for a writ of certiorari challenging the site development plan approval. West Bluff raises issues of law related to the approval of the site plan which are appropriate for our limited review on certiorari.

{2} Pursuant to Rule 12–505 NMRA 2002, we determine whether the City's decision approving the site development plan conflicts with any "statutory provision, ordinance or agency regulation," which is, in part, how our review is defined by that rule. It is also alleged that the decision to approve the site development plan conflicts with the City master plan and its various sub-plans, and we determine whether those conflicts are justiciable under the limitations placed on certiorari by Rule 12–505. We also determine whether the actions of the City and its agencies denied West Bluff minimum requirements of due process of law. We affirm the decision of the district court.

## BACKGROUND

{3} On September 16, 1999, the City of Albuquerque Environmental Planning Commission (EPC) approved a site development plan, for subdivision and building permit, for a 34–acre retail shopping center near the northeast corner of Coors Boulevard and Interstate 40 in Albuquerque. The proposed site plan is characterized by two large buildings (a Home Depot and a Wal–Mart), as well as a few smaller businesses, on two separate parcels of land. This site plan is a scaled-down version of an earlier, 65 acre plan that was initially approved by the EPC, but ultimately rejected by the City Council at West Bluff's urging. Thereafter, the developer submitted the amended site plan application, which downsized the project in an effort to conform with existing zoning.

{4} The EPC found that the revised site development plan for the 34–acre shopping center (hereafter Site Plan) conformed generally with the City's comprehensive plan and its constituent parts (hereafter the master plan) and with applicable City ordinances. Following the EPC's approval of the Site

Plan, West Bluff filed an appeal with the City Council. On November 10, 1999, the City Council's Land Use, Planning and Zoning Committee (LUPZ) reviewed the matter. The LUPZ determined that the EPC had not erred and found the Site Plan to be in substantial compliance with the relevant City zoning ordinances, and with the City's master plan. The LUPZ recommended that the appeal not be heard by the full City Council. The City Council subsequently adopted the LUPZ findings and recommendations and filed its final decision on November 23, 1999, affirming the Site Plan approval.

{5} West Bluff filed a statutory appeal to the district court, pursuant to NMSA 1978, § 39-3-1.1 (1999) and Rule 1-074 NMRA 2002. On August 7, 2000, the district court affirmed the City's approval of the Site Plan. After applying unsuccessfully for extraordinary writ review from the Supreme Court, West Bluff successfully petitioned this Court for a writ of certiorari pursuant to Rule 12-505.

## DISCUSSION

{6} After the parties in this case completed their appellate briefs, this Court clarified the scope of our review in certiorari cases. *See C.F.T. Dev., LLC v. Bd. of County Comm'rs*, 2001-NMCA-069, 130 N.M. 775, 32 P.3d 784 (hereafter *C.F.T.*). In *C.F.T.*, we held that "Rule 12-505 limits both the grounds on which we will issue a writ of certiorari and the review we will thereafter conduct of a district court decision in an administrative appeal." *Id.* ¶ 11. We will review a decision below if it is in conflict with a New Mexico appellate opinion, or with "any statutory provision, ordinance or agency regulation." Rule 12-505(D)(5)(a), (b). We will also review significant questions of constitutional law and issues of substantial public interest. Rule 12-505(D)(5)(c), (d).

{7} We will not, however, review a decision below for an abuse of discretion, nor will we determine whether a decision was supported by substantial evidence. *C.F.T.*, 2001-NMCA-069, ¶¶ 9-11, 130 N.M. 775, 32 P.3d 784. These tasks are solely for the district court sitting in its appellate capacity. *Id.* ¶ 9. In the case before us, the district court examined the factual record compiled below, and determined that the City's decision to affirm the Site Plan was supported by substantial evidence. We do not review that decision on certiorari.

{8} West Bluff does raise certain questions of law that are appropriate for our review on certiorari. Specifically, West Bluff alleges that the City's approval of the Site Plan conflicted with City ordinances, which we will discuss in due course. West Bluff also implicates rights set forth in New Mexico appellate decisions, as well as the due process clause of the federal constitution. We review these questions under Rule 12-505(D)(5)(a)-(c). West Bluff did not persuade us that any of its issues on appeal are matters of "substantial public interest" which is an alternative ground for our review under Rule 12-505(D)(5)(d). *See C.F.T.*, 2001-NMCA-069, ¶ 12, 130 N.M. 775, 32 P.3d 784 (declining to define the "seemingly rare instances" when a petitioner could successfully fashion a substantial public interest argument).

{9} The principal thrust of this appeal, however, is West Bluff's claim that the City violated its own master plan when it approved the Site Plan. For us to review such a claim on certiorari, we must determine whether, as West Bluff argues, the master plan has a force of law similar to that of a "statutory provision, ordinance or agency regulation," such that it would be appropriate for our review under Rule 12-505(D)(5)(b).

## CONFLICT WITH THE MASTER PLAN

### Statutory Provisions

{10} We look first to New Mexico statutes to examine the legal effect the legislature has envisioned for master plans in general. Our goal in interpreting a statute is to give effect to the intent of the legislature. *In re Extradition of Martinez*, 2001-NMSC-009, ¶ 14, 130 N.M. 144, 20 P.3d 126.

{11} In Chapter 3, Article 19 of the New Mexico statutes, entitled "Planning and Platting," the legislature empowered municipalities to establish planning commissions and to delegate to these planning commissions the authority to "adopt, amend, extend and carry out a general municipal or master plan."

NMSA 1978, § 3–19–1(D) (1965); *see also* NMSA 1978, § 3–19–4 (1965) (describing powers accorded to a municipal planning commission). Most germane to our inquiry is NMSA 1978, § 3–19–9(A) (1970), which provides for the creation of city master plans:

> The planning commission *shall* prepare and adopt a master plan for the physical development of the municipality and the area within the planning and platting jurisdiction of the municipality.... The planning commission may amend, extend or add to the plan or carry any part or subject matter into greater detail.... *The plan shall be made with the general purpose of guiding and accomplishing a coordinated, adjusted and harmonious development of the municipality* which will, in accordance with existing and future needs, best promote health, safety, morals, order, convenience, prosperity or the general welfare as well as efficiency and economy in the process of development.

(Emphasis added.)

█ {12} The master plan is to contain "recommendations of the planning commission for the physical development of the municipality," including "the general location, character, layout and extent of community centers and neighborhood units." Section 3–19–9(B)(4). Thus, the legislature has assigned to the master plan the role of guide, enabling municipal planning commissions to use reasonable discretion in applying its provisions to the actual decision-making processes involved in municipal development.

{13} The role of guide for master plans is also evident in New Mexico case law. In *Dugger v. City of Santa Fe*, 114 N.M. 47, 55, 834 P.2d 424, 432 (Ct.App.1992), this Court discussed the legal effect of a municipal master plan, construing Section 3–19–9(A). In *Dugger*, we determined that the legislature intended master plans to be advisory in nature. *Id.* We also examined the particular city master plan in question and found that it set out broad priorities, provided guidelines, and made recommendations regarding factors that "should" be considered. *Id.* We held that such a plan was advisory, had no regulatory effect, and did not interfere with the City's final decision-making authority in

regard to annexation or bind the City to any specific procedures. *Id.* Although *Dugger* involved a city's refusal to enact an ordinance granting annexation by petition, our discussion of the master plan was not strictly limited to that context. *Id.* We noted that city planning documents are typically adopted by resolution, which "do[ ] not carry the weight of law, as do ordinances for municipalities." *Id.* (citing *Williams v. City of Tucumcari*, 31 N.M. 533, 249 P. 106 (1926)). *But see W. Old Town Neighborhood Ass'n v. City of Albuquerque*, 1996–NMCA–107, ¶ 12, 122 N.M. 495, 927 P.2d 529 (clarifying that the difference between an ordinance and a resolution "depends less on what it is called, and more on what it seeks to accomplish," and holding that a sector plan, which was expressly imbued with the ability to create zoning changes, could create zoning changes having the force of law), *superseded by statute on other grounds as stated in C.F.T.*,2001– NMCA–069, ¶¶ 6–15, 130 N.M. 775, 32 P.3d 784.

█ {14} West Bluff responds with statutory language found in Chapter 3, Article 21, entitled "Zoning Regulations," to support its argument that the City's master plan has the weight of law. In Article 21, the legislature provided that "[t]he regulations and restrictions of the county or municipal zoning authority are to be *in accordance with* a comprehensive plan." NMSA 1978, § 3–21–5(A) (1970) (emphasis added). West Bluff suggests that this language incorporates the comprehensive plan by reference, giving it a legal stature on a par with zoning ordinances, regulations, and other such restrictions that do have the force of law.

{15} In our view, West Bluff reads too much into the Section 3–21–5 reference. We understand the "in accordance with" language of Section 3–21–5(A) to require that land use planning regulations and decisions be guided by a city master plan and generally be consistent with a city master plan. However, we do not infer from that one phrase that the legislature intended master plans to be strictly adhered to in the same manner as a statute, ordinance, or agency regulation. *See, e.g.*, Stuart Meck, *Evolving Voices in Land Use Law*, 3 Wash. U. J.L. &

Pol'y 295, 297–306 (2000) (noting that despite the widespread adoption of the "in accordance with" model statutory language, states vary widely in their approaches to land use planning, with many states treating comprehensive land use plans as advisory and others revising their legislation to clarify the relationship between zoning and planning).

{16} West Bluff also argues that NMSA 1978, § 3–21–11 (1965) gives the City's master plan the force of law. That statute, entitled "Conflicts between zoning regulations and other statutes and ordinances," provides:

> If any other statute or regulation *or other local ordinance, resolution or regulation adopted under authority of Sections 3–21–1 through 3–21–14* NMSA 1978 [Article 21: Zoning Regulations] is applicable to the same premises, the provision shall govern which requires:
>
> A. the greater width or size of yards, courts or other open spaces;
>
> B. the lower height of building or a less number of stories;
>
> C. the greater percentage of lot or land to be left unoccupied;
>
> D. or imposes, other higher standards.

*Id.* (emphasis added). Generally speaking, Section 3–21–11 indicates a legislative choice that, in the event of conflict, the more restrictive zoning provision will trump the less restrictive zoning provision. West Bluff argues that the use of the word "resolution" in the statute incorporates into this hierarchical scheme master plans which are promulgated by resolution. Thus, in the event of conflict, West Bluff's interpretation of Section 3–21–11 would have master plans supersede less restrictive provisions in the zoning ordinances. Relying on its interpretation of Section 3–21–11, West Bluff claims that just such a conflict occurred in this case: a conflict between the more restrictive master plan provisions and a less restrictive zoning ordinance. West Bluff asks us to review that conflict on certiorari.

{17} However, we are not persuaded by West Bluff's interpretation of Section 3–21–11. The phrase "adopted under authority of Sections 3–21–1 through 3–21–14" modifies the phrase "ordinance, resolution or regulation." *See State ex rel. Dep't of Pub. Safety v. One 1990 Chevrolet Pickup,* 115 N.M. 644, 648, 857 P.2d 44, 48 (Ct.App.1993) ("Where the context requires that a qualifying word or phrase apply to several preceding phrases, the qualifying word or phrase will not be restricted to its immediate antecedent.").

{18} Only those resolutions adopted under the authority of Chapter 3, Article 21, which pertain to "Zoning Regulations," will supersede less restrictive zoning. Notably, the City's master plan was adopted under the authority of Chapter 3, Article 19, "Planning and Platting," rather than Article 21. *See* § 3–19–9. The master plan is not a zoning document within the meaning of Section 3–21–11, and therefore, the master plan does not trump less restrictive zoning ordinances pursuant to that statute.

{19} Having considered each of West Bluff's statutory references to Articles 19 and 21 of Chapter 3, we are not persuaded that the legislature has intended to imbue master plans with a force of law equal to statutes or ordinances for purposes of our review on certiorari. Although municipal planning commissions are required to create master plans, and zoning regulations and decisions are to be "in accordance with" those master plans, the legislature has assigned them a different role from that of statute or ordinance. What the legislature has elected not to do, we cannot change by judicial fiat.

**City Ordinances**

{20} Having determined that the New Mexico statutory scheme does not give master plans the force of law equivalent to a statute or ordinance, we turn next to the City of Albuquerque ordinances. West Bluff correctly argues that, regardless of state statute, the City may elect to incorporate its master plan into an ordinance, thereby giving it the same legal effect. As with statutory construction, the fundamental principle of construction for city ordinances is to determine and carry out the intent of the legislative body, in this case the Albuquerque City Council. *See, e.g., W. Old Town Neighborhood Ass'n,* 1996–NMCA–107, ¶ 14, 122 N.M. 495, 927 P.2d 529.

{21} West Bluff relies on *Atlixco Coalition v. County of Bernalillo*, 1999–NMCA–088, ¶ 1, 127 N.M. 549, 984 P.2d 796, in which we reversed the county commission's approval of an amendment to a special use permit that would have allowed a landfill operator to expand its construction debris landfill into a municipal waste landfill. At issue in *Atlixco* was the legal effect of the county's Ground Water Protection Policy and Action Plan. *Id.* ¶¶ 4–7. That Plan expressly prohibited the expansion or creation of new municipal or privately owned landfills in areas designated for water protection. *Id.* ¶¶ 13–16. Although the Ground Water Protection Policy and Action Plan was initially adopted by resolution, it was subsequently incorporated by reference into a formally adopted county ordinance. *Id.* ¶ 16. Because the ordinance required "compliance with" the Plan in the disposal of solid wastes, we concluded that the county commission erred when it approved a permit amendment that conflicted with the Plan. *Id.* ¶¶ 17–22.

{22} West Bluff argues that the City did the same thing with its master plan. Accordingly, we must determine whether, as in *Atlixco*, the City intended to bind itself by ordinance to strict adherence to the master plan. To answer that question, we must examine in more detail the City ordinances that refer to the master plan and its component parts.

{23} The City's planning code provides for a three-tiered approach to land use. *See* City of Albuquerque Code of Ordinances § 14–13–1–2. The City's master plan is comprised of a hierarchy of increasingly specific planning documents. The Rank One Plan, which is called the Albuquerque/Bernalillo County Comprehensive Plan (ABCCP), is the "basic long range city policy for the development and conservation of the entire metropolitan area." Section 14–13–1–2(A). Rank Two plans may be either Facility Plans or Area Plans that typically cover "15 or more square miles, and specify important development standards." Section 14–13–1–2(B). The West Side Strategic Plan (WSSP) is a Rank Two Area Plan that covers the location of the proposed development. Finally, Rank Three plans cover a much smaller area with the greatest level of specificity. Section 14–13–1–2(C). The Coors Corridor Plan (CCP), a Rank Three Sector and Neighborhood Development Plan, covers the location of the Site Plan. These planning documents operate together to form the City's master plan.

{24} Unlike Rank One and Two plans, Rank Three plans can, but are not required to, "create special zoning regulations for the area covered, and may also specify other fairly detailed development parameters." City of Albuquerque Code of Ordinances § 14–13–1–2(C)(1); *see also W. Old Town Neighborhood Ass'n,*1996–NMCA–107, ¶ 22, 122 N.M. 495, 927 P.2d 529 (holding that the city had expressly intended to give Rank Three Sector Plan zoning changes the force of law, where the resolution establishing a Sector Plan was passed with all the formalities of a zoning ordinance and explicitly enabled the Sector Plan to create zoning changes). The force of law given to an explicit Rank Three zoning change is not in dispute in this appeal. *See* City of Albuquerque Code of Ordinances § 14–13–1–2. West Bluff does not contend that the zoning in force at the development site is superseded by a more restrictive Rank Three zoning change. Rather, West Bluff relies on other, more general provisions of the City's master plan documents.

{25} Like the New Mexico statutes discussed earlier in this opinion, City ordinances refer to the master plan in general advisory terms. For example, one of the Subdivision Regulations, Section 14–14–1–3(A), says that land development should be coordinated "in accordance with" the master plan. *See also* § 3–21–5(A) (stating similarly that zoning regulations should be "in accordance with" a comprehensive plan). Elsewhere, the City provides that the "*general nature* and extent of the lots and uses proposed shall conform to" the plan and that plat approval must not "contain[ ] elements *clearly and significantly inconsistent* with the adopted plans." City of Albuquerque Code of Ordinances § 14–14–2–2(A) (emphasis added). This choice of language in the subdivision ordinances indicates that the City must not approve development that is clearly offensive to the master plan, but it does not import that the plan is to be

strictly applied, provision by provision, in the same manner as an ordinance.

{26} Similarly, the City Zoning Code states that "[t]his article is intended *to help achieve* . . . the city's master plan." Comprehensive City Zoning Code § 14–16–1–3 (emphasis added). The Zoning Code also provides that "[s]ite [d]evelopment [p]lans are expected to meet the requirements of adopted city policies and procedures." Comprehensive City Zoning Code § 14–16–3–11(B). This City ordinance language indicates that the master plan sets goals and community objectives that should guide decision makers as they apply the plan to a proposed development. But, again, there is no indication that the City has tried to transform the legal effect of its master plan beyond the advisory document described in state statute.

{27} Finally, West Bluff points out that the City Zoning Code also states:

Where the provisions of any other ordinance, *resolution,* or covenant impose greater restrictions than those of this article, the provisions of such other ordinance, resolution, or covenant shall prevail.

Comprehensive City Zoning Code § 14–16–1–4 (emphasis added). Because the City's planning documents were passed by resolution, West Bluff construes this ordinance as providing that zoning will be trumped by any master plan language that is more restrictive. However, in considering the language of all the relevant ordinances, we are not persuaded of any such intent on the part of the City Council. Although a specific zoning change proposed by a Rank Three Sector Development Plan would prevail over pre-existing zoning, this does not extend to the more general policy language contained in the master plan. *See* City of Albuquerque Code of Ordinances § 14–13–1–2(C).

{28} In contrast to *Atlixco,* the City has not incorporated its master plan specifically and unambiguously by ordinance, and therefore, we do not accord the master plan the same weight as the specific plan at issue in *Atlixco. See Atlixco Coalition,* 1999–NMCA–088, ¶¶ 16, 23, 127 N.M. 549, 984 P.2d 796.

**The Master Plan**

{29} The master plan itself also indicates that the City did not intend these land use planning documents to be strictly applied in the same manner as ordinances. City Resolution 103–88 states that the ABCCP's goals and policies "shall serve as *general guidelines* for land use, environmental, and resource management decisions." (Emphasis added.) The resolution also states that city regulations "shall conform to the *general* policies of the *Comprehensive Plan.*" (Emphasis added.) The ABCCP, the Rank One Plan, is a 207 page document, which identifies numerous goals, proposing policies for each goal listed, and offering "possible techniques" related to each policy.

{30} The WSSP, the relevant Rank Two Plan, states that its policies are intended to guide "growth and development on the West Side." The WSSP explicitly notes that it does not create zoning changes. It provides community descriptions, but notes that these descriptions are "approximate." The WSSP is a 272–page planning document, identifying a great number of policies and possible techniques for addressing the many goals listed. City Resolution 35–1997 states that the WSSP "provides a framework . . . , proposes design and development policies . . . , [and was] adopted as [a] general guide to growth and development for the west side."

{31} The CCP is the applicable Rank Three Sector and Neighborhood Development Plan. Although the CCP does make several zoning changes which have the force of law, it does not alter the zoning for the area encompassed within the Site Plan. *See* City of Albuquerque Code of Ordinances § 14–13–1–2(C)(1). The CCP also "provides policy and design guidelines" for development within the Coors Corridor area, which "shall be guided by this plan."

{32} When viewing the master plan as a whole, we note that these planning documents contain numerous, sometimes conflicting policies and recommendations, generally presented in broad, advisory language. By their own terms, the components of the master plan are policy and planning documents. Because of the many policies addressed, it might be difficult to create a project that

strictly met every guideline or policy set forth in the master plan. To illustrate the point, both West Bluff and the City are able to find language in the master plan documents in support of their differing positions.

{33} In the process of considering a proposed site plan, a municipality must apply its expertise in weighing and balancing many factors and policy concerns, a practice which necessitates an exercise of discretion. Because the needs of a municipality do not remain static, planning goals and policies must be flexible in order to adapt to fluctuating community needs and growth patterns. *See, e.g., State ex rel. Village of Los Ranchos de Albuquerque v. City of Albuquerque,* 119 N.M. 150, 157, 889 P.2d 185, 192 (1994) (stating that a "municipality is most qualified to evaluate engineering problems, traffic patterns, and all the other subtleties involved" in a building project). The master plan appears to anticipate and accommodate this need for flexibility, while outlining the relevant policy considerations. Based on our review of the planning documents, we are not persuaded that the City intended to bind itself to them in the same manner, and to the same degree, that it does with city ordinances. However, we emphasize that City officials are not free to ignore the master plan, but must utilize the master plan as a policy guide in the decision-making process.

{34} The record indicates that both the EPC and the LUPZ appropriately considered the master plan in a manner consistent with both state statute and municipal ordinance. The EPC findings discuss provisions of the three relevant planning documents in some detail, before finding that the Site Plan was in general compliance with the master plan. In addition, the EPC imposed upon the developer a number of conditions that addressed policy concerns arising from the master plan. Upon review of the EPC's decision, the LUPZ explicitly found the Site Plan to be in "substantial compliance" with the master plan, and found that the EPC did not abuse its discretion or act arbitrarily and capriciously in its approval of the Site Plan. On direct statutory appeal, the district court agreed.

{35} Because we conclude that the City master plan is not the equivalent of a "statutory provision, ordinance or agency regulation" within the meaning of our rule on certiorari, we will not review the question of the City's compliance with its master plan or the district court decision on that issue. That question presents a non-justiciable issue under Rule 12–505(D)(5)(b). *See C.F.T.,*2001–NMCA–069, ¶¶ 9–15, 130 N.M. 775, 32 P.3d 784; *cf. Bennett v. City Council,* 1999–NMCA–015, ¶¶ 30–36, 126 N.M. 619, 973 P.2d 871 (reviewing, pre-*C.F.T.,* proposed zoning changes in terms of their compliance with a comprehensive plan under the whole record standard of review).

## CONFLICT WITH CITY ORDINANCES AND REGULATIONS

{36} Aside from alleging conflict with the master plan, West Bluff argues that the City's Site Plan approval was contrary to specific City ordinances. This presents a justiciable question on certiorari pursuant to Rule 12–505(D)(5)(b). *See C.F.T.,*2001–NMCA–069, ¶ 8, 130 N.M. 775, 32 P.3d 784.

### Community Commercial Zoning

{37} West Bluff argues that the proposed development is inappropriately large for a C–2 Community Commercial zone in violation of the City zoning ordinances. C–2 or Community Commercial zoning "provides suitable sites for offices, *for most service and commercial* activities, and for certain specified institutional uses." Comprehensive City Zoning Code § 14–16–2–17 (emphasis added); *see, e.g., Embudo Canyon Neighborhood Ass'n v. City of Albuquerque,* 1998–NMCA–171, ¶ 9, 126 N.M. 327, 968 P.2d 1190 (describing C–2 commercial activities as, "for example, a McDonald's, Wal–Mart, Home Base, or a full-service liquor establishment"), *superseded by statute on other grounds as stated in C.F.T.,*2001–NMCA–069, ¶¶ 6–15, 130 N.M. 775, 32 P.3d 784.

{38} West Bluff points out that the proposed development meets the glossary definition of a "regional scale shopping center," rather than that of a "community scale shopping center," as set forth in the City's Rank One Plan, the ABCCP. Based on that definition, West Bluff argues that such a large

development would only be appropriate in a C–3 or Heavy Commercial Zone. *See* Comprehensive City Zoning Code § 14–16–2–18 (describing uses permitted in Heavy Commercial Zone).

{39} We are not persuaded by West Bluff's efforts to apply the ABCCP glossary terms to the Zoning Code. The Zoning Code contains its own glossary, defines its own terms, and does not classify land usage by the same categories as the ABCCP. More importantly, the Zoning Code clearly contemplates that C–2 usage may include shopping centers. *See* Comprehensive City Zoning Code §§ 14–16–2–17(A)(12), (G); 14–16–1–5(B). We conclude that the City's approval of the Site Plan complied with C–2 zoning requirements.

**Contiguity**

{40} West Bluff also argues that the City violated its Zoning Code by considering a site plan that consists of two non-contiguous lots. Lying between the two parcels is a 380–foot strip of land that was originally a part of the larger, previously rejected, site plan application. However, this parcel is under different ownership and is not a part of the Site Plan that is at issue in this appeal. West Bluff relies on the City Zoning Code's definition section to support the notion that the City can not legally consider a site plan consisting of two, non-contiguous parcels. The Zoning Code defines "premises" as "[a]ny lot *or combination of contiguous lots* held in single ownership, together with the development thereon." Comprehensive City Zoning Code § 14–16–1–5 (emphasis added). Additionally, the Code defines a "shopping center site" as "[a] *premises* containing five or more acres." *Id.* (emphasis added). West Bluff reads these definitions together as an overt prohibition against a Site Plan made up of non-contiguous lots.

{41} We are not persuaded. Nowhere does the Zoning Code expressly require contiguity for site plan approval. *See* Comprehensive City Zoning Code § 14–16–3–11 (describing site plan approval requirements). The glossary definition of "premises," absent a specific provision in the site plan approval requirements, does not con-

vince us that the City intended to disallow the consideration of a site plan consisting of two non-contiguous, but closely related, lots. The glossary reference to contiguous lots is, at best, ambiguous. In the face of ambiguity in a code, we ordinarily defer to how the city council, as its author, interprets that code. *See High Ridge Hinkle Joint Venture v. City of Albuquerque*, 119 N.M. 29, 38, 888 P.2d 475, 484 (Ct.App.1994) (indicating deference is given to an agency's interpretation of its own regulations). We accord such deference to the City in this instance.

{42} The EPC consulted with the City attorney's office and the zoning manager, who advised the EPC that there was no regulatory reason, in this case, to require separate applications for each tract of land. The EPC determined that a unified Site Plan would allow a more comprehensive review of cumulative air and traffic impact, as well as give it an opportunity to address other factors, such as architectural continuity. The City Council's LUPZ committee affirmed the approval of the Site Plan, although it consisted of two non-contiguous lots.

{43} Even if we were to assume that the City erred by accepting a site plan application that consisted of two non-contiguous tracts of land, West Bluff has not explained how it was injured by the simultaneous consideration of both parcels. Nor has West Bluff explained to us how the submission of two separate site plan applications would have been to its advantage or made the ultimate approval of the shopping center any less likely. *See In re Estate of Heeter*, 113 N.M. 691, 695, 831 P.2d 990, 994 (Ct.App. 1992) ("On appeal, error will not be corrected if it will not change the result."). The consolidation of the two related parcels, rather than a more piecemeal approach, allowed the EPC to consider the cumulative impact of the proposed development. This is not an unreasonable application by the City of its own code.

**Air Quality Study**

{44} West Bluff also contends that approval of the Site Plan was unlawful because the air quality analysis submitted by

the developer failed to comply with the recommendations of the City Environmental Health Department (EHD). Despite the EHD's recommendations, the City did not require the developer to submit a twenty-year horizon study, which would have required air quality projections twenty years into the future. West Bluff argues that City ordinance does not contemplate approval of a site plan, if the developer fails to provide the air quality studies requested by the EHD.

{45} We disagree. The Comprehensive City Zoning Code, Section 14–16–3–14(E), states that "[a]cceptance of Environmental Health Director's findings and recommendations will be at the discretion of the decision making body." The report listing the EHD's findings and recommendations expressly stated that acceptance of the recommendations were "at the discretion of the Planning Commission." Based on the record provided to us, we determine that the EPC complied with City ordinances when it chose not to adopt the EHD's recommendation for an additional air quality study. *See High Ridge Hinkle Joint Venture,* 119 N.M. at 38, 888 P.2d at 484 (indicating deference is given to an agency's interpretation of its own regulations).

## QUESTIONS OF DUE PROCESS

{46} West Bluff contends that the City's decision-making process violated its procedural due process rights of the protestants. *See generally Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *see also* Rule 12–505(D)(5)(c) (providing that significant constitutional questions are appropriate for our review on certiorari). We note, at the outset, that the City is not required to conduct its public, quasi-judicial hearings following the same evidentiary and procedural standards applicable to a court of law, although it must adhere to fundamental principles of justice and procedural due process. *See State ex rel. Battershell v. City of Albuquerque,* 108 N.M. 658, 662, 777 P.2d 386, 390 (Ct.App.1989). "In administrative proceedings due process is flexible in nature and may adhere to such requisite procedural protections as the particular situation demands." *Id.*

{47} At the September 1999 EPC hearing, after the developer spoke in support of the Site Plan application, the EPC decided to use a sign-up sheet and allotted five minutes to each speaker because so many concerned citizens wanted to speak. Some of the additional speakers were in favor of the Site Plan and some were opposed. West Bluff argues that those opposing the Site Plan were given less total time than proponents of the project. Our review of the record indicates that the EPC made efforts to be fair to all parties. Furthermore, both sides were allowed to submit their written comments into the record. The City did not violate West Bluff's due process rights by imposing reasonable limitations on speaking. *See Bennett,* 1999–NMCA–015, ¶ 16, 126 N.M. 619, 973 P.2d 871 (holding imposition of reasonable time limits did not violate due process where all parties in attendance who wanted to make a statement did so and where the city council had the record of statements both for and against a proposed zoning change).

{48} Several advertised public hearings were held leading up to the EPC's approval of the revised Site Plan. Formal notice was mailed to all registered neighborhood associations. Furthermore, site plan applications are matters of public record. West Bluff was allowed to present its arguments throughout this process. Notably, West Bluff was successful in defeating the much larger development originally proposed. West Bluff was also allowed to submit many letters, petitions, and hundreds of pages of documentation in support of its position. Upon appeal of the EPC decision, West Bluff was allowed to argue further in support of its position before the LUPZ. Ultimately, the district court, after hearing the arguments of all parties, affirmed the City's decision, despite West Bluff's argument, that its due process rights had been violated. Our review of the record leads us to conclude that West Bluff had ample notice and a meaningful opportunity to be heard with regard to its position opposing this development.

{49} West Bluff also contends that its due process rights were violated by the lack of a disinterested decision maker. It

argues that one of the EPC commissioners should have recused himself due to a potential conflict of interest. Early in 1999, a member of one of the protesting neighborhood associations intervened in a private, unrelated quiet title action, in which one of the EPC commissioners was a party. The issue of a potential conflict was raised at the EPC hearing, and the commissioner stated for the record that the situation did not present a conflict for him. West Bluff nonetheless argues that there may have been an appearance of impropriety.

{50} On May 18, 2000, the district court issued a letter ruling reversing the City's approval of the Site Plan because the court initially concluded that the EPC commissioner in question should not have heard the matter when it was before the EPC. The developer asked the court to reconsider, arguing that West Bluff had waived any right to request recusal by failing to raise the issue until it was apparent that the commissioner was in favor of the Site Plan approval. The district court subsequently agreed with the developer, changed its position, and affirmed the City's approval of the Site Plan.

{51} West Bluff does not allege any actual bias on the part of the commissioner. We also note that the EPC approved the Site Plan by a vote of six-to-one. *See Heeter,* 113 N.M. at 695, 831 P.2d at 994 (declining to correct error where result would not be changed). Even if we were to assume that the district court erred in finding that West Bluff waived the right to request a recusal, the facts do not suggest that West Bluff was prejudiced by the commissioner's involvement in these proceedings.

{52} We recognize that agency decision makers are held to ethical standards. *See In re Comm'n Investigation,* 1999–NMSC–016, ¶ 42, 127 N.M. 254, 980 P.2d 37 (describing objective standard where the impartiality of a judge might reasonably be questioned); *High Ridge Hinkle Joint Venture,* 119 N.M. at 40, 888 P.2d at 486 (holding where a court defers to an agency's interpretation of an enactment, a decision maker should be disqualified where an objective observer would entertain reasonable questions about the decision maker's impar-

tiality). However, we have also recognized that "not all allegations of bias or prejudice are of the type that render a proceeding fundamentally unfair or require the disqualification of a decisionmaker." *In re Comm'n Investigation,* 1999–NMSC–016, ¶ 41, 127 N.M. 254, 980 P.2d 37; *see also Siesta Hills Neighborhood Ass'n v. City of Albuquerque,* 1998–NMCA–028, ¶ 20, 124 N.M. 670, 954 P.2d 102 (stating that city council members are not expected to be "so insulated from their community as to require them to be detached from all issues coming before them"). West Bluff is correct that city officials should avoid acting on matters where they have a conflict of interest, or where their actions give rise to an appearance of impropriety. However, we are not persuaded that, under the circumstances of this particular case, West Bluff's allegations rise to the level of a violation of due process of law that would invalidate the entire proceeding below.

**CONCLUSION**

{53} For the foregoing reasons, we affirm the decision of the district court.

{54} **IT IS SO ORDERED.**

WE CONCUR: LYNN PICKARD and MICHAEL D. BUSTAMANTE, Judges.