2006-NMCA-143

149 P.3d 67

**ALBUQUERQUE COMMONS PARTNERSHIP, Petitioner–Appellee,**

v.

**CITY COUNCIL OF the CITY OF ALBUQUERQUE, Respondent–Appellant.**

**Nos. 24,026, 24,027, 24,042.**

Court of Appeals of New Mexico.

April 26, 2006.

Revised Dec. 19, 2006.

Certiorari Granted, No. 29,791, Nov. 29, 2006.

Metter & LeCuyer, P.C., Stephen T. Le-Cuyer, Bryan & Flynn–O'Brien, George R. Pat Bryan III, Timothy V. Flynn–O'Brien, Albuquerque, NM, for Appellee.

Robert M. White, City Attorney, Mark Hirsch, Assistant City Attorney, Miller Stratvert P.A., Alice T. Lorenz, Campbell & Wells, P.A., John S. Campbell, Albuquerque, NM, Robinson & Cole, LLP, Dwight H. Merriam, James A. Wade, Gregory W. McCracken, Hartford, CT, for Appellant.

Cassutt, Hays & Friedman P.A., Kenneth J. Cassutt, Santa Fe, NM, Garvey, Schubert & Barer, Edward J. Sullivan, Carrie Richter, Portland, OR, for Amicus Curiae American Planning Association.

Anita P. Miller, Attorney at Law, P.C., Anita P. Miller, Albuquerque, NM, Noble & Wickersham, LLP, Jay Wickersham, Cambridge, MA, for Amicus Curiae Boston Society of Architects.

Keleher & McLeod, P.A., Richard L. Alvidrez, Albuquerque, NM, for Amicus Curiae Greater Albuquerque Chamber of Commerce.

New Mexico Municipal League, Inc., Randall D. Van Vleck, Santa Fe, NM, Freilich, Leitner & Carlisle, Robert H. Freilich, Robin A. Kramer, Elisa L. Paster, Kansas City, MO, for Amici Curiae New Mexico Municipal League, National League of Cities, and International Municipal Lawyers Association.

## OPINION

CASTILLO, Judge.

{1} On motion for rehearing, the opinion filed December 9, 2005, is withdrawn, and the following opinion is substituted in its place. Additionally, we append an order on rehearing, in which we address four issues argued in the motion for rehearing that were not developed in the original opinion, were not addressed, or need clarification. The motion is otherwise denied.

{2} This case is before us on the City Council of the City of Albuquerque's (City or City Council) appeal from a jury verdict and on writs of certiorari that we granted to review district court appeals of two administrative decisions, all relating to the City's 1995 amendment of the Uptown Sector Plan (95USP). The district court determined that the amendment targeted the property of Albuquerque Commons Partnership (ACP) and resulted in a downzoning of that property. The district court ordered the City to consider ACP's development plan under the previous sector plan, the 1981 Uptown Sector Plan (81USP). Upon remand, the City considered the development plan under the 81USP and denied the development. ACP appealed that denial to the district court. The court determined that the City had not reviewed the development as ordered and concluded that the development had to be approved. In the meantime, ACP's claim for damages for vio-lation of constitutional rights, resulting in a taking and violation of civil rights in connection with the 95USP, proceeded to a jury trial. The jury found for ACP and awarded damages of $8,349,095. We reverse the district court's initial conclusion regarding the 95USP. Because that conclusion formed the basis for the other two decisions, those decisions are likewise reversed.

## I. BACKGROUND

{3} The record in these consolidated cases is quite extensive and involves several thousand pages of record. With this in mind, we will summarize many of the basic facts in chronological order and then incorporate specific facts into the discussion of the issues as necessary.

### A. Development of the 81USP

{4} The City's Comprehensive Plan designated the Uptown Sector as one of several urban centers in the City. The Uptown Sector is located in the northeast section of Albuquerque, approximately 6.5 miles from the downtown area. It contains more than 2 million square feet of retail space, primarily in the two regional malls, Winrock Center and Coronado Mall. In addition, the area contains 1.9 million square feet of office space, or 23 percent of the total office space in Albuquerque. The area provides the highest concentration of retail and office uses outside of downtown.

{5} An urban center is described as an area containing the highest densities and the tallest and most massive structures. It is intended to concentrate a wide range of community activities and intense land uses for greater efficiency, stability, image, and diversity and for a positive effect on the urban form, environmental quality, and the transportation network. Albuquerque Bernalillo County Comprehensive Plan (Comprehensive Plan) at 15 (1988, amended 1991). The goal of an urban center is "to create specially designed concentrations of high-density mixed land use and social/economic activities which reduce urban sprawl, auto travel needs, and service costs, and which enhance the urban experience." *Id.* at 69.

{6} In 1981, the City implemented the 81USP. It defined the area governed by the plan and set out the governing concepts for development in the area. Part of the plan dealt with traffic and transportation in the area, as well as specifically contemplating the construction of a loop road located in roughly the center of the sector. Excluding roads, the Uptown Sector covers approximately 460 acres. Under the 81USP, the majority of the Uptown Sector was zoned SU–3, the periphery was zoned SU–2, and the single-family homes along San Pedro Drive were zoned R–1 to protect the existing residential uses. These zoning classifications were not changed in the 95USP. *See* map of Uptown Sector Development Plan Parcel Zoning (Appendix A) and map of Uptown Sector outlining inner core surrounded by Loop Road (Appendix B). SU–3 zoning provides suitable sites for high-intensity mixed uses— commercial, office, service, and residential. SU–2 provides suitable sites for a low-to medium-intensity mixture of office, service, institutional, and residential uses as a transition area between the core of the urban sector center and the surrounding low-density residential uses. The 81USP contained specific standards for site development plans in the SU–2 and SU–3 zones and required site development plan approval by the City Planner and the Environmental Planning Commission. The 81USP did not mandate development densities or limit the amount of retail use in a development and did not impose structured parking requirements. The 81USP did, however, repeatedly refer to pedestrian-friendly landscaping, open space, and building orientation within the center of the Uptown Sector, in accordance with the City's Comprehensive Plan. According to the Comprehensive Plan, Uptown is one of several urban centers; an urban center is defined as having a concentration of contiguous uses that include the highest densities and tallest and most massive buildings, providing a unique sense of place.

{7} From 1981 to 1988, there were minor amendments to the original 81USP, none of which affected the uses delineated in the original plan. Accordingly, we refer to the 1981 Uptown Sector Plan, as amended through 1988, as the 81USP. Review of the 81USP for content revision began in 1989; in March 1993, the revisions began in earnest. In March 1994, the first draft of the revisions to the 81USP was distributed to various agencies for comment.

## B. First Two Site Development Plans

{8} ACP is a Texas general partnership whose principal partner is Albuquerque Uptown Partnership, another Texas general partnership. At all times material in this case, ACP was the leaseholder under a long-term ground lease with the Archdiocese of Santa Fe of the old St. Pius High School site, consisting of approximately 28 acres (28–acre parcel) located at the northeast corner of Louisiana Blvd. NE and Indian School Rd. NE, in the center of Albuquerque's Uptown Sector. The western 19.3 acres of the 28–acre parcel are located in the SU–3 zone, and the eastern 8.7 acres are located in the SU–2 zone. In 1987, ACP submitted a site development plan under the 81USP, consisting of a hotel, multistory office buildings, retail facilities, and a 7–acre arboretum. This proposed development included almost 1.3 million square feet in office space, 121,323 square feet dedicated to retail, and a 400–room hotel. The plan was approved by the City but was never built.

{9} The 28–acre parcel remained undeveloped until 1991, when ACP decided to sell its leasehold. ACP selected Opus Southwest Corporation (Opus) to assume development of the property. Opus proposed either to purchase or to lease the property if Opus could obtain approval of its site development plan. In June 1994, Opus submitted a site development plan for a 28–acre low-density "big box" retail shopping center. Because the site development plan included property in the SU–2 zone, Opus also requested a zone map amendment, as well as an amendment to the 81USP. The public strongly opposed the plan, and Opus withdrew it on August 31, 1994. The opposition was based on differing views of the type of development that was appropriate for the Uptown Sector: the suburban nature of the Opus plan conflicted with the expectation of most of the surrounding property owners that development of undeveloped land in the center of the Uptown

Sector would be urban in character. The opposition became public; the negative reaction of the surrounding property owners to the Opus site development plan was reported by at least one newspaper, and a number of letters criticizing the project were sent to the planning department, one of which was copied to the Mayor and councilors.

## C. Final Site Development Plan and Development of the 95USP

{10} Soon after Opus withdrew its application, in mid-September 1994, the City passed Memorial M7–1994, requesting a comprehensive public review and revision to the 81USP. The City stated that it was desirous of fulfilling the vision of the plan, observed that the 81USP was in need of significant revision and strengthening, and requested that the planning department present its "plan-amendment recommendations and a record of the public review" of the 81USP to the City's Environmental Planning Commission (EPC) for consideration by the end of April 1995.

{11} On September 30, 1994, two weeks after passage of M7–1994, Opus submitted a second application, this time for development of a smaller, 17.9–acre low-density "big box" project. The project was to be located entirely in the SU–3 zone, so no amendments to the zoning map or sector plan were requested. *See* preliminary site plan (Appendix C).

{12} At this point, events follow two concurrent tracks: Opus focused its energy on obtaining site approval for the smaller development under an unrevised 81USP, while the planning department was obtaining public input, arranging for studies to be conducted, scheduling public hearings, and working on revising the 81USP as per the terms of M7–1994. The following is a summary of these activities.

{13} A public workshop on Uptown Sector issues was presented for developers, landowners, businesses, and neighborhood leaders by the planning department in early November 1994; the department thus complied with the request for "comprehensive public review," as contained in M7–1994. The workshop was attended by about seventy-five people and covered numerous development issues, including mixed uses, evolving market demand and conditions, transportation, air-quality maintenance, and population trends, among others. The idea of identifying an intense urban core inside Loop Road was discussed, as was the use of a floor area ratio (FAR). "FAR" is defined as the leasable floor space divided by the site's square footage. Participants considered other related issues, such as balancing retail use, proposing internalized parking, encouraging evening activity, and improving transportation management. Information from this meeting was considered by the City in its revision of the 81USP.

{14} The Opus site plan had been originally set for a hearing in November before the City's EPC. Because Opus wanted to revise the site plan, based on agency and staff comments, Opus agreed to a deferral of that hearing to the January EPC meeting. Opus's revised site plan (Opus site plan) was referred to the EPC for review on January 1995. At the hearing on January 12, 1995, the EPC conducted a lengthy discussion regarding whether the Opus site plan should be deferred, pending revision of the 81USP. The EPC ultimately decided to continue the hearing until the January 26, 1995, meeting. At this meeting, the EPC was informed that the City was considering a moratorium on development in the Uptown Sector, pending revision to the sector plan. Based on that information, the EPC deferred hearing Opus's development plan until February 9. The City Council was concerned that development in the Uptown Sector during the pending review and approval of amendments to the 81USP might be inconsistent or in conflict with the proposed revisions; therefore, on February 6, the City Council passed R–187. This resolution placed a four-month moratorium on all development within the Uptown Sector. On February 9, 1995, the EPC deferred hearing Opus's development plan until June, after the end of the moratorium. There was no appeal of the imposition of the moratorium.

{15} In February 1995, the planning department used a fast-track schedule with specific deadlines to prepare information necessary to evaluate proposed revisions to the

81USP. This information included a traffic impact analysis, an air quality and building intensity analysis, and a travel demand management scheme. By March 2, 1995, the revised plan was distributed for review. The focus of the revised plan was to quantify the policy set forth in the 81USP so that a true urban center would be sure to result. The amendments to which ACP objected were related to the additional regulations for an area inside the Loop Road, referred to as an intense urban core (intense core). Although the zoning designation remained SU–3, development in the intense core would require a minimum FAR of .7 and a maximum FAR of 1.5. A FAR of .7 requires that the leasable floor space be at least 70 percent of the site's total square footage. A high FAR requires building up with very little parking space. Therefore, development would have to be predominantly office or other high-density use, with only specialty retail and commercial on the ground floor. All parking would be required to be in structures, except for a small number of spaces serving the ground-level establishments.

{16} The proposed revisions established a minimum FAR of .3 outside the intense core and a maximum of 1.0, thus allowing shopping centers and other retail uses. The amendments also required a Transportation Management Organization of Uptown, by which employers were to implement strategies to reduce single-occupant car trips to the area. Also included were recommendations regarding making the area more pedestrian friendly. The Albuquerque planning department made these recommendations on the bases that development in the area was becoming suburban and that the 81USP needed quantification in order for the City to maintain the policy objectives in urban areas of intense mixed use.

{17} The amendments were set for a series of public hearings before the EPC, the Land Use Planning and Zoning Committee (LUPZ), and the City Council. Through all of the public hearings, ACP and Opus were vocal and vehement in their objection to the amendments, which they argued effected a downzoning of their property. The public, representatives of neighborhood associations, and others provided testimony for and against all or part of the proposed revisions. Typically, the public viewed the proposed revisions to the 81USP as a way to "create a new sense of place, and protect [their] neighborhood[s] from suburban sprawl." One proponent was concerned about the suburban sprawl to be created by the type of project proposed by Opus, which was described as "a [nineteen-]acre site, [fifteen] of [which] will be parking." Generally, the neighborhood associations urged a follow-through with the vision of Uptown as a true urban center, and they opined that this would be the long-term solution to transportation and air quality concerns.

{18} The first public hearing on the proposed revisions was held on April 13, 1995, before the EPC. After the staff presentation, the EPC heard comments from proponents and opponents of the proposal. On May 10, 1995, the LUPZ met and took testimony both from the planning department and the public. On May 24, 1995, a joint meeting of the EPC and the LUPZ was held. At that time, traffic, transportation, and air quality studies were reported. Issues that had been raised by the public at the April EPC hearing and the May 10 LUPZ meeting were addressed by a supplemental staff report presented at the joint meeting.

{19} At the conclusion of the joint meeting, the EPC continued with its meeting and voted 5–3 to recommend against the amendments. In the notification of its decision to LUPZ, the EPC found that the air pollution problem in the Uptown area would not be significantly affected by the land uses advocated, especially without a citywide traffic management plan. It also pointed out that there was testimony from developers suggesting that the FAR minimums and maximums would make development uneconomical, as evidenced by development in the downtown urban sector with similar FARs. Finally, the EPC found that the proposed amendment to the 81USP did not comply with Resolution 270–1980, which sets forth certain requirements that must be met in cases of zone changes. The text of this resolution is contained in paragraph 64 herein. The EPC agreed that the sector plan

needed revising but stated that the revisions proposed were unsatisfactory.

{20} The LUPZ met on May 30, 1995, and continued discussion on the amendments to the plan. The testimony at this hearing specifically addressed the findings on which the EPC based its recommendation not to adopt the revised plan. As to air pollution, a planner with the Environmental Health Division addressed the differences between the Parson's air quality study done for the City and the analysis of the data by JHK & Associates (JHK) that was performed for ACP. In addressing JHK's position that there was no meaningful difference in air quality between high-density office use and retail, the planner explained that the JHK conclusion was based on selected data only and that when all the data are used, mixed uses, together with any amount of transportation management strategies, will result in fewer exceedances of the carbon monoxide standards.

{21} Also at this meeting, there was testimony from three people with experience in the real estate or financial field, who provided information regarding office vacancy rates in Uptown and who were of the opinion that the vacant land in the intense core could develop under the 95USP. One of the witnesses represented an owner of vacant land in the intense core.

{22} As to the need to follow the requirements of Resolution 270–1980, the city attorney explained that in his opinion, the changes to the sector plan were not map changes and that the resolution therefore did not apply. At the close of the testimony, one of the councilors observed that the problems inherent in the findings of the EPC had been "significantly addressed" during the meeting of the LUPZ. At the conclusion of the LUPZ hearing, the committee voted to send the revised sector plan on to the full City Council.

{23} The City Council met on June 5, 1995, to hear the matter. At that time, a number of amendments were proposed that had apparently been the result of negotiation among councilors, their constituents in the neighborhoods surrounding the Uptown Sector, and Uptown Sector businesses. Because the public had not been given the amendments prior to the meeting and was unprepared to discuss the amendments, the City Council deferred final hearing on the matter for about two weeks.

{24} On June 19, 1995, after adoption of several amendments to the revised sector plan and extensive argument both for and against the plan, the City Council voted 7–0 in favor of the revisions to the 81USP. In its resolution adopting the 95USP (Resolution 94–1995), the City Council made a number of findings, including that the plan's policy objectives needed to be quantitatively defined. It found that Uptown, as an urban center, affects the entire City and that Uptown's land use, transportation, and development have an impact on the safety and air quality of the entire metropolitan area.

{25} On July 6, 1995, the EPC voted to defer indefinitely Opus's site plan because it did not comply with the 95USP. Thereafter, ACP filed a petition in district court for review of the approval and adoption of the 95USP. ACP's complaint in district court sought review of the adoption of the 95USP and review of the City's refusal to hear the Opus site plan under the 81USP. That complaint was later amended to include claims for damages for violation of constitutional rights, resulting in a taking of property and violation of civil rights. The district court conducted the administrative review of the adoption of the 95USP first and, for the reasons detailed in paragraph 32 herein, concluded that the intense core provisions of the 95USP could not be applied to the Opus site plan. The district court therefore remanded the matter to the City to consider the Opus site plan under the 81USP, the previous sector plan.

{26} The EPC heard the plan in November 1999 and denied it on the basis that it did not create the type of urban place that the master plan had intended. ACP appealed to the City Council, which agreed with the EPC and voted to deny the development. An appeal to district court resulted in a determination that the site plan did in fact comply with the 81USP, and the district court ordered that the plan be approved.

{27} The City filed a petition for writ of certiorari from that administrative decision. We denied the writ, based on our determination that the entire case had not yet been disposed of and that the appeal was premature. *Albuquerque Commons P'ship v. City of Albuquerque,* 2003-NMCA-022, ¶ 1, 133 N.M. 226, 62 P.3d 317.

{28} In February 2003, a jury trial was conducted on ACP's claims of constitutional taking and violation of due process. The claims were based on the City's adoption of the 95USP and its application to ACP's property. The jury was instructed that the law of the case was that ACP's property had been downzoned and that ACP was entitled to a quasi-judicial hearing before the property was downzoned. Finding that ACP's due process rights were violated, the jury awarded damages.

{29} After judgment on the verdict, the City filed two petitions for writ of certiorari with regard to the two administrative decisions on the adoption and application of the 95USP. The City also filed a notice of appeal from the jury verdict. All three cases are consolidated.

## II. DISCUSSION

{30} We begin with the review of the district court's order as it relates to the City's enactment of the 95USP.

### A. Standard of Review for Administrative Review

{31} This Court reviews a district court's decision in an administrative appeal under an administrative standard of review. *Gallup Westside Dev., LLC v. City of Gallup,* 2004-NMCA-010, ¶ 10, 135 N.M. 30, 84 P.3d 78. In so doing, "[w]e 'conduct the same review of an administrative order as the district court sitting in its appellate capacity, while at the same time determining whether the district court erred in the first appeal.'" *Id.* (quoting *Rio Grande Chapter of the Sierra Club v. N.M. Mining Comm'n,* 2003-NMSC-005, ¶ 16, 133 N.M. 97, 61 P.3d 806). "The district court may reverse an administrative decision only if it determines that the administrative entity, here the City, acted fraudulently, arbitrarily, or capriciously; if

the decision was not supported by substantial evidence in the whole record; or if the City did not act in accordance with the law." *Gallup Westside Dev., LLC,* 2004-NMCA-010, ¶ 10, 135 N.M. 30, 84 P.3d 78. A reviewing court may not substitute its judgment for that of the City. *Id.* ¶ 11. In making our determination, we independently review only the record before the district court regarding the City Council's adoption of the 95USP.

### B. Decision of the District Court Regarding the 95USP

{32} On June 17, 1998, the district court prepared a letter decision with a detailed explanation of the decision on the various issues presented, including the adoption of the 95USP. The court entered its order (Order) on July 23, 1999, together with findings of fact and conclusions of law relating to the Order. Essentially, the district court determined that the 95USP created a new zone—the intense core—and that the creation of this new zone amounted to a downzoning of ACP's property. The district court further concluded that the downzoning was contrary to the *Miller* rule. *Miller v. City of Albuquerque,* 89 N.M. 503, 505, 554 P.2d 665, 667 (1976) (requiring evidence of a change or a mistake before downzoning property). The court also determined that the City had violated Resolution 270–1980 and that the zoning action was a quasi-judicial act. Based on these conclusions, the district court prohibited the City from applying the intense core provisions of the 95USP to the Opus site plan application.

{33} Below, we discuss (1) quasi-judicial versus legislative action, (2) text amendments and rezoning, (3) uniformity, (4) Resolution 270–1980, (5) downzoning, and (6) the "change or mistake" rule. Before we address these issues, however, it is important to examine the basic way the district court viewed this case and why that approach was inconsistent with the applicable standard of review, thereby leading to the errors we hold are present.

{34} In the decision letter, the district court pointed out that there are two completely different views of this case. One "is

the story of a very careful, thorough, inclusive process of developing creative legislation to amend the Sector Development Plan of a critical section of the city." The other involves the placing of the burden of fulfilling a vision of Uptown on a single property owner. The district court concluded that this case was the second situation. Our review of the record shows otherwise.

**{35}** Under whole record review, the district court may not substitute its judgment for that of the agency—the City in this case—and must evaluate whether the record supports the result reached, not whether a different result could have been reached. *See, e.g., Zamora v. Vill. of Ruidoso Downs,* 120 N.M. 778, 784, 907 P.2d 182, 188 (1995); *Hernandez v. Mead Foods, Inc.,* 104 N.M. 67, 71, 716 P.2d 645, 649 (Ct.App.1986), *limited on other grounds, Graham v. Presbyterian Hosp. Ctr.,* 104 N.M. 490, 491–92, 723 P.2d 259, 260–61 (Ct.App.1986). If there is evidence in the record to support the result reached by the agency, the district court is to affirm, even if it would have found the facts differently or reached a different result had the court been the decision maker in the first instance. *State v. Seal,* 75 N.M. 608, 609–10, 409 P.2d 128, 129 (1965). In this case, the district court recognized the evidence supporting the conclusion that the City carefully considered the amendments to the sector plan in a critical area of the City; however, it appears the district court directed its attention to the effect of the City's decision on ACP's property and, in doing so, failed to evaluate the evidence supporting the City's decision. Because the record contains evidence supporting the decision of the City, this, among other reasons, forms the basis for our conclusion that the City's action was legislative in nature and that no downzoning occurred. As we consider the parties' arguments, we will detail, as necessary, the evidence presented in support of the City's action and evaluate that evidence in light of the legal issues presented.

## C. Issues

### 1. Quasi-judicial Versus Legislative Action

**{36}** The nature of the City's action is pivotal in this case. Accordingly, we begin our discussion of the issues by evaluating whether the adoption of the 95USP was a quasi-judicial or legislative action. The district court found and concluded that the most burdensome of the new requirements in the 95USP fell on ACP and on two other parcels; that the creation of an intense core constituted a downzoning of ACP's property; that the City treated the amendment as a legislative action and not a zone change of a small area, requiring quasi-judicial procedures to be followed; and that ACP was entitled to, and did not receive, quasi-judicial review of its objections to the downzoning. We have explained the basic differences between legislative action and quasi-judicial action in *KOB–TV, L.L.C. v. City of Albuquerque,* 2005–NMCA–049, ¶¶ 19–20, 137 N.M. 388, 111 P.3d 708. In summary, legislative action reflects public policy relating to matters of a permanent or general character, is not usually restricted to identifiable persons or groups, and is usually prospective; quasi-judicial action, on the other hand, generally involves a determination of the rights, duties, or obligations of specific individuals on the basis of the application of currently existing legal standards or policy considerations of past or present facts developed at a hearing conducted for the purpose of resolving the particular interest in question. *Id.* Generally, legislative actions result in the formulation of a general rule of policy, and quasi-judicial actions result in the application of a general rule of policy. Consequently, application of a general rule to a particular piece of property, as occurred in the rezoning of a single property in *West Old Town Neighborhood Ass'n v. City of Albuquerque,* 1996–NMCA–107, ¶ 11, 122 N.M. 495, 927 P.2d 529, *superceded by statute on other grounds, as stated in C.F.T. Development, LLC v. Board of County Commissioners,* 2001–NMCA–069, ¶ 14, 130 N.M. 775, 32 P.3d 784, is quasi-judicial. Often, quasi-judicial actions begin with the filing of an application by an individual property owner, who requests some type of relief that is authorized when certain facts are present. Examples include matters like approval of the property owner's proposal to build a gas station in a parking lot, applications for con-

ditional use permits, and petitions for variances. *See, e.g., Lewis v. City of Santa Fe,* 2005–NMCA–032, ¶ 18, 137 N.M. 152, 108 P.3d 558 (holding that the city's decision to approve a gasoline station was quasi-judicial in nature); *State ex rel. Battershell v. City of Albuquerque,* 108 N.M. 658, 662, 777 P.2d 386, 390 (Ct.App.1989) (deciding that hearings before a zoning hearing examiner and the Environmental Planning Commission regarding an application for conditional use permits were quasi-judicial); *Duke City Lumber Co. v. N.M. Envtl. Improvement Bd.,* 95 N.M. 401, 402, 622 P.2d 709, 710 (Ct.App.1980) (determining that a public hearing to consider a petition for a variance in air-quality regulation was quasi-judicial).

{37} Here, the district court found that the vacant property remaining to be developed in the intense core was controlled by only three parties. However, the fact that the vacant property remaining to be developed here belongs to a limited number of parties does not mean that the zoning action was necessarily quasi-judicial in nature. " '[T]he central focus, in our view, should be on the nature of the governmental decision and the process by which that decision is reached.' " *Jafay v. Bd. of County Comm'rs,* 848 P.2d 892, 898 (Colo.1993) (en banc) (quoting *Cherry Hills Resort Dev. Co. v. City of Cherry Hills Vill.,* 757 P.2d 622, 626 (Colo.1988) (emphasis omitted)). *Jafay* analyzed the zoning action to see if it applied to only a single site or whether it established an areawide policy regarding future urban growth. 848 P.2d at 898. If the zoning decision has general application and was drawn to apply in the same way currently and in the future to all similarly situated properties, it is legislative. *See Rockville Fuel & Feed Co. v. City of Gaithersburg,* 266 Md. 117, 291 A.2d 672, 680 (1972). As we stated in *KOB–TV,* "a legislative decision may appear adjudicatory when parties focus on the effect of the particular decision on individual rights. However, policy decisions generally begin with the consideration and balancing of individual rights." 2005–NMCA–049, ¶ 22, 137 N.M. 388, 111 P.3d 708 (internal quotation marks and citation omitted).

{38} First, we observe, as did the district court, that the burden of the restrictions does not fall solely on ACP. It is only that ACP's property is vacant and yet to be developed. Two other vacant properties are also subject to the restrictions, and there are other properties within the intense core that, in large part, already comply with the density and parking restrictions. For example, the Park Square block overall has a FAR of about 1.15 with a mixture of office, specialty retail, and commercial. Moreover, contrary to ACP's argument, any redevelopment that occurs within the core must abide by these restrictions. ACP is not prevented from developing its property. It must simply now abide by the density and parking restrictions of the intense core. Zoning as "governmental regulation of the uses of land and buildings" always affects a property owner's ability to use his property as he sees fit. *Miller,* 89 N.M. at 505, 554 P.2d at 667 (internal quotation marks and citation omitted). The fact that he cannot use it as he wants is simply the price of living in a modern community. *Id.* (recognizing that incidental economic loss resulting from zoning restrictions is "merely the price of living in a modern enlightened and progressive community" (internal quotation marks and citation omitted)).

{39} Second, the fact that a particular party's proposed development or a particular parcel is in the mind of the zoning authority when it takes action does not change the nature of the decision. *KOB–TV,* 2005–NMCA–049, ¶ 24, 137 N.M. 388, 111 P.3d 708. ACP argues that its property was targeted in the revisions to the sector plan. We agree that ACP's proposed big-box development did influence the timing of the amendments to the sector plan. This is not determinative. As we stated in *KOB–TV,* "the fact that a zoning authority considers a particular party's proposed development or a particular parcel when it takes actions does not change the nature of the decision." *Id.* (citing *Atlanta Bio–Med, Inc. v. DeKalb County,* 261 Ga. 594, 408 S.E.2d 100, 102 (1991)). Although there was evidence that community concerns may have influenced the City's actions, the record is clear that legitimate concerns about the development of the

Uptown Sector formed a basis for the revision. We cannot say, and the district court did not hold, that the City's decision in this case to adopt the 95USP was based solely on public outcry or a desire to prevent ACP from developing its property. Rather, there is much in the record supporting the City's position that the decision was premised on a desire to clarify and strengthen the 81USP. Indeed, the very terms of the adopting resolution outline the various purposes for which it was enacted. These purposes include strengthening the sector plan, quantitatively defining the Comprehensive Plan's policy objectives, and maintaining the area as an urban center. Revisions to the 81USP were made in order to achieve these purposes. We reverse the district court and hold that the adoption of the 95USP was a legislative act.

## 2. Text Amendment and Rezoning

{40} Another question here is the characterization of the City's zoning action. In concluding that the creation of the intense urban core amounted to an illegal downzoning, the district court found that the 95USP created a "new zone." The City maintains, and has from the beginning, that the adoption of the 95USP was not a rezoning of ACP's property but was a text amendment to the zoning code, which strengthened the existing regulations in order to assure development of an urban center, as already required by the 81USP and Comprehensive Plan. ACP disagrees. It points to the differences in allowed uses between the intense core and the area outside the intense core, both of which are in the SU–3 zone, and argues that these changes are so drastic that they essentially effect a rezoning from unrestricted retail to predominately office. ACP compares the type of projects approved under the 81USP with those that would be allowed under the 95USP and concludes that the 95USP does not strengthen the existing regulations but rather severely restricts formerly approved uses. Last, ACP contends that the district court correctly considered the creation of the intense core zone a fundamental change in the uses of ACP's land and that this constitutes a zone change, regardless of the City's characterization of the amendment.

{41} We address ACP's "fundamental change" argument first. In *Nesbit v. City of Albuquerque*, 91 N.M. 455, 458, 575 P.2d 1340, 1343 (1977), we held that a proposed amendment to a development plan increasing units from 83 to 287 constituted a fundamental change in a zoning restriction and thus required notice and public hearing. Zoning law regarding "fundamental change" relates to the necessity for notice and hearing on the items delineated in the notice. *Id.* There is no contention here that the notice was inadequate. The law regarding "fundamental change" does not set forth the differences between a text amendment and rezoning. For this distinction, we look elsewhere.

{42} We now turn to the characterization of the City's action in adopting the 95USP. We observe that the parties and the district court used the terms "rezoning" and "zone change" to mean the creation of a new zoning district. A zoning ordinance generally consists of two parts: (1) the text setting forth procedures and regulations relating to the various districts and (2) the map showing where such districts are located. 1 Norman Williams, Jr., and John M. Taylor, *American Land Planning Law* § 17:4, at 464 (rev. ed.2003). After a zoning ordinance is enacted, changes are made by zoning amendments. Ziegler describes all zoning amendments as "rezonings" and divides them into three main categories: map amendments, text amendments, and amendments to procedures. 3 Edward H. Ziegler, Jr., *Rathkopf's The Law of Zoning and Planning* (*Rathkopf's*) §§ 38:2 to 38:4, at 38–3 to –4 (2005). The most common type of rezoning is a zoning map change that involves the zoning district reclassification of a particular tract of land by alteration of the official zoning map. 3 *Rathkopf's, supra* § 38:2, at 38–3. Then there is the change to a zoning text or code that specifies the allowed or permitted uses within a particular existing zoning district classification. 3 *Rathkopf's, supra* § 38:3, at 38–3 to –4. Zoning text amendments do not affect the zoning district classification, but rather change the allowed or permitted uses within a particular zoning district. *Id.* A zoning text amendment is exemplified by an ordinance that changes the use restrictions

applicable to a particular zone. 6 Patrick J. Rohan, *Zoning and Land Use Controls* § 39.02[1], at 39–2 (1992). The last type of rezoning, which is not at issue in this case, involves changes to specific procedural requirements under a zoning ordinance. 3 *Rathkopf's, supra* § 38:4, at 38–4.

{43} Based on the above, the critical question is not whether there was a "rezoning," but rather whether the City's amendment to its zoning code was accomplished by map amendment or by text amendment.

{44} New Mexico law recognizes that a text amendment is different from a zone reclassification; the general term "rezoning" seems to refer to a zone reclassification by map amendment, much as Ziegler does later in his treatise. 3 *Rathkopf's, supra* § 39:2, at 39–2 to –3. We base this on two cases: *KOB–TV,* 2005–NMCA–049, ¶¶ 8, 27, 137 N.M. 388, 111 P.3d 708, and *Mandel v. City of Santa Fe,* 119 N.M. 685, 894 P.2d 1041 (Ct.App.1995). In *KOB–TV,* the television station (KOB) had been legally operating a helicopter from its studios, located on property zoned SU–2/O–1. 2005–NMCA–049, ¶¶ 2, 3, 137 N.M. 388, 111 P.3d 708. In 1997, the City issued to KOB a building permit for construction of a helipad on the property, after which KOB began remodeling its facility to include the helipad and purchased a $1 million helicopter. *Id.* ¶ 3. Thereafter, the City adopted an amendment to its zoning code restricting the location and operation of all helicopters, except medical and law enforcement helicopters, to SU–1 zones. *Id.* ¶ 23. Based on the amendment, the City revoked the permit allowing KOB's helipad use. *Id.* ¶ 9. We characterized the ordinance as a text amendment. *Id.* ¶ 8. There was no change in the zoning of KOB's property, but the zoning amendment affected the uses allowed on the property by eliminating helipad use. *Id.* ¶ 27. Similarly to the amendment in *KOB–TV,* the revisions to the 81USP did not change the zoning classification of ACP's property but arguably affected the uses to which ACP could put the property.

{45} In *Mandel,* the City of Santa Fe amended the city zoning code to permit the Historic Design Review Board to impose height restrictions in historic districts (Height Amendment). 119 N.M. at 686, 894 P.2d at 1042. The Height Amendment went into effect while Mandel's development was being considered by city authorities, and his proposal was ultimately denied on the basis of inappropriate second-story structures, as prohibited by the Height Amendment. *Id.* at 686–87, 894 P.2d at 1042–43. One of Mandel's arguments objecting to the imposition of the height restrictions was that if the underlying zoning permits a certain height, any lessening of that height is in effect a rezone. *Id.* at 688, 894 P.2d at 1044. We disagreed. *Id.* We noted that the zoning of Mandel's property remained the same but that its location in a historic district made the property subject to more restrictive requirements. *Id.* Imposition of height restrictions "does not mean the property has been rezoned." *Id.*

{46} ACP argues that passage of the 95USP was tantamount to enacting an amendment to the zoning map because the 95USP effectively created two zones: the intense core and outside the intense core. We are not persuaded. As in *KOB–TV* and *Mandel,* the zoning in the Uptown Sector remains SU–3, which allows for the high-intensity mixture of commercial, residential, and retail uses encouraged in an urban center. Any development in the SU–3 zone requires approval of a site development plan. Although the zoning remained the same, the 95USP denoted different uses, building densities, and parking limitations in the intense core and outside the intense core. We view the different uses, building densities, and parking restrictions in the intense core of the Uptown Sector no differently than we viewed the historic overlay in *Mandel.*

{47} ACP also contends that the City's argument that the 95USP was merely a "text amendment" is inconsistent with *West Old Town Neighborhood Ass'n.* We disagree. *West Old Town Neighborhood Ass'n* dealt with a zoning classification in a sector plan covering property in the greater Old Town area, both inside and outside the city boundaries. 1996–NMCA–107, ¶ 4, 122 N.M. 495, 927 P.2d 529. Rejecting the City's argument that the zoning classification in the sector plan was merely advisory as to land outside

the city limits, we held that because the sector plan established RA–1 zoning for "the area it covered, the change to SU–1 was rezoning." *Id.* ¶ 18. Unlike the change to the underlying zoning classification in the Old Town sector plan, the 95USP does not change any of the zoning classifications established in the 81USP. Consequently, ACP's argument fails.

{48} The 95USP amended the City's zoning code. While we agree that this was a rezoning, *see* 3 *Rathkopf's, supra* § 38:3, at 38–3 to –4, the rezoning was accomplished by text amendment, not map amendment. This conclusion relates to our evaluation of the following issues: Resolution 270–1980, downzoning, and application of the "change or mistake" rule.

### 3. Uniformity

{49} ACP contends that the City attempted to avoid the rezoning rules by creating a new SU–3 intense core zone in the guise of revising the 81USP. ACP argues that the regulations of the intense core were not applicable citywide or even to all SU–3 designated property in the 81USP and thus violated the requirement of uniformity, as specified by NMSA 1978, § 3–21–1(B)(2) (1995). Section 3–21–1(B)(2) allows a municipal zoning authority to "regulate or restrict the erection, construction, reconstruction, alteration, repair or use of buildings, structures or land in each district. All such regulations shall be uniform for each class or kind of buildings within each district, but regulation in one district may differ from regulation in another district." So the question becomes whether all restrictions within one zone must be uniform.

### a. History of Zoning

■ {50} To answer this question we look to the history of zoning as it applies to sector plans. Zoning is defined as "governmental regulation of the uses of land and buildings according to districts or zones." *Miller,* 89 N.M. at 505, 554 P.2d at 667 (internal quotation marks and citation omitted). "When used to promote the public interest, it is justified and has been upheld as a legitimate exercise of the police power."

*Id.* (citing *Euclid v. Ambler Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926)). From the *Euclid* case comes the term "Euclidean" zoning which "describes the early zoning concept of separating incompatible land uses through the establishment of fixed legislative rules that would be largely self-administering." 1 Edward H. Ziegler, Jr., *Rathkopf's The Law of Zoning and Planning* § 1:5, at 1–21 (2005). Generally, by means of Euclidean zoning, a municipality divides an area geographically into particular use districts and specifies certain uses for each district. Each district, or zone, is then dedicated to a particular purpose—residential, commercial, or industrial—and each zone will appear on the municipality's official zoning map. *Id.* § 1:3, at 1–18. "Euclidean zoning . . . exists more in form than in fact in many communities today. The modern trend clearly is towards greater flexibility and discretionary review of proposed individual uses." *Id.* § 1:5, at 1–24 (footnote omitted). This flexibility is apparent in the Comprehensive Plan and the 81USP, which contemplated an urban center, zoned the bulk of the property in Uptown as SU–3, and required site development approval to accomplish the goals of the plans. As observed in *Rathkopf's,*

> [o]ver the years, . . . many communities . . . have come to recognize the potential benefits of providing for mixed-use development in selected areas. . . . These districts usually provide a set of development, performance and design standards that are specifically tailored to a particular area in order to deal with problems of compatibility and to implement a community's predominant use and density plan for that area. Mixed-use districts often are utilized near downtown business areas [and] in uptown business centers. . . .

*Id.* § 11:12, at 11–40 to –41 (footnote omitted).

■ {51} As to the uniformity requirement in these mixed-use districts, "[s]o long as zoning classifications and restrictions do not arbitrarily discriminate between owners or lands similarly situated, the 'uniformity' requirement in zoning is unlikely to be held to be violated." *Id.* § 11:16, at 11–53. "Gen-

erally, the uniformity requirement has not significantly limited the modern trend toward more intensive and site[-]specific regulation of land development through special zoning districts and discretionary development review." *Id.* at 11–53 to –54.

### b. Uniformity Concept

■ {52} The uniformity concept is discussed at length in *Giger v. City of Omaha*, 232 Neb. 676, 442 N.W.2d 182, 194–95 (1989), where the court concluded that the uniformity requirement does not prohibit different classifications within a district, so long as they are reasonable and based on the public policy to be served. The court relied on *Charter Township of Oshtemo v. Central Advertising Co.*, 125 Mich.App. 538, 336 N.W.2d 823, 826 (1983) (explaining that the township rural zoning act, which provides that zoning ordinance provisions be uniform for each class of land, buildings, dwellings, and structures throughout the district, is subject to the "reasonableness" exception, allowing reasonable restrictions based upon different conditions within the zone), and *Quinton v. Edison Park Development Corp.*, 59 N.J. 571, 285 A.2d 5, 9–10 (1971) (recognizing that the statute that requires zoning regulations be uniform for each class or kind of buildings or other structures, as well as for uses of land throughout each district, does not prohibit classifications within a district, as long as they are reasonable). In *Charter Township of Oshtemo*, the Michigan court of appeals held that allowing billboards only in those parts of "C" zoned areas within 150 feet of an interstate highway and its business route was reasonable, based on the type of sign and driving patterns. 336 N.W.2d at 826. In *Quinton*, the New Jersey supreme court upheld a 100–foot buffer strip between adjacent business and residential use when the business is located on a 10– or more acre tract, so as to protect adjacent residential areas from noises, lights, and other disturbances that accompany large commercial developments, even when the residential area to be protected is in an adjoining municipality. 285 A.2d at 6, 10. In both cases, the reviewing courts evaluated the restriction in light of its purpose and recognized a reasonableness exception. We see no reason why such an exception should not apply here. *See* 1 Kenneth H. Young, *Anderson's American Law of Zoning* § 5.25, at 454–55 (4th ed.1996). The uniformity requirement does not prohibit a different classification within a district, as long as it is reasonable and based upon the public policy to be served. *See also Montgomery County v. Woodward & Lothrop, Inc.*, 280 Md. 686, 376 A.2d 483, 501–02 (1977) (finding no violation of the uniformity provision in requiring a certain portion of the FAR to be designated for parking in one business district but not in another when both business districts are located in the same zoning district); *Rumson Estates, Inc. v. Mayor of Fair Haven*, 177 N.J. 338, 828 A.2d 317, 329–30 (2003) (deciding that the uniformity requirement is not absolute and that as long as similarly situated property is treated the same, different conditions in same zoning district, such as special requirements for single-family dwellings located on steep slopes, would permit different regulations).

{53} ACP relies on *Smith v. Board of County Commissioners*, 2005–NMSC–012, ¶ 33, 137 N.M. 280, 110 P.3d 496, for the propositions that regulations restricting the use of land must be clear and fair and must apply equally to all and that "standard-less regulation that depends on no more than a zoning official's discretion would seriously erode basic freedoms that inure to every property owner." ACP argues that the restrictions imposed for the property located in the intense core violated this basic tenet and were unreasonable and that they therefore violated the uniformity requirement.

■ {54} We fully agree with the proposition in *Smith*, but we disagree with ACP's assertion that the 95USP violates the proposition. As we have stated before, the 95USP quantified the direction already provided in the 81USP. The 81USP specifically states that the SU–3 zone in the Uptown Sector "provides suitable sites for a high intensity mixture of commercial, office, service, institutional, and residential uses." The permissive uses set out in the plan were all "subject to site development plan approval." Specifying FARs, structures for parking, and mixed use in the center of the Uptown Sector achieves

the basic premise set out in the 81USP. Just because a use is permitted does not mean that a project with that use will be approved. *See W. Bluff Neighborhood Ass'n v. City of Albuquerque*, 2002–NMCA–075, ¶ 3, 132 N.M. 433, 50 P.3d 182 (explaining that the original site plan for a 65–acre development approved by the EPC was ultimately rejected by the city council), *overruled in part on other grounds, Rio Grande*, 2003–NMSC–005, ¶ 16, 133 N.M. 97, 61 P.3d 806. Numerous factors must be considered in order to have a site plan approved. *W. Bluff*, 2002–NMCA–075, ¶ 33, 132 N.M. 433, 50 P.3d 182 ("In the process of considering a proposed site plan, a municipality must apply its expertise in weighing and balancing many factors and policy concerns, a practice which necessitates an exercise of discretion."). The City exercised the required discretion in evaluating ACP's site plan, and the plan was properly rejected under both the 81USP and the 95USP.

### c. Rationales

{55} In this case, there are at least two rationales for more intense building requirements in the inner core: (1) to encourage intense urban uses in the Uptown Center, as envisioned by the 81USP and the Comprehensive Plan, and (2) to improve air quality. In Resolution 94–1995, the City found that the Uptown area is designated by the Comprehensive Plan as one of five urban centers and one of only three that are zoned SU–3, as permitted by the Code. The City also found that the revisions to the 81USP were "in response to current needs and trends in the area" and were needed to "strengthen its land use, transportation, [and] environmental and urban design components and to quantitatively define the Plan's policy objectives."

### i. Comprehensive Plan and Code Provisions

{56} The Comprehensive Plan identified several issues associated with implementing the urban center concept contained in the 1975 Comprehensive Plan, a concept by which sector plans would delineate "clear, uniform design standards that would sketch each center's unique character, and their re-lationship to surrounding neighborhoods." The Comprehensive Plan noted that land use, zoning, and transportation decisions made between 1975 and 1986 had undermined the effective implementation of the concept but observed that with rigorous support and effort to contain intense uses in designated urban center areas, the concept might succeed. The Council's finding was based in part on this language in the Comprehensive Plan.

{57} At the May 10 meeting of the LUPZ, Joel Water, the Albuquerque planning manager, explained that the Uptown Center was envisioned as having mixed urban uses with the highest building masses in the city. The idea of an intense core inside the Loop Road to ensure the urban nature of the area was discussed at the public workshop held on November 9, 1994. This idea was incorporated into the proposed revisions to the 81USP. From the review of the comments at the several meetings at which the revisions were discussed, it becomes clear that the revisions were designed to strengthen the urban nature of the area and prevent suburban sprawl. Requiring more intense uses in the very center of the Uptown Sector is a reasonable approach to meeting the definitional requirements of an Urban Center as defined in the Comprehensive Plan as it existed prior to the events in this case.

{58} As we have previously recognized in *West Bluff*, 2002–NMCA–075, ¶¶ 23–24, 132 N.M. 433, 50 P.3d 182, the Code has a three-tiered approach to land use. The City's master plan consists of a hierarchy of increasingly specific planning documents. *W. Bluff*, 2002–NMCA–075, ¶ 23, 132 N.M. 433, 50 P.3d 182. The Rank One Plan is the "basic long range city policy for the development and conservation of the entire metropolitan area." Code § 14–13–1–2(A); *W. Bluff*, 2002–NMCA–075, ¶ 23, 132 N.M. 433, 50 P.3d 182. Rank Two Plans are Facility or Area Plans that typically cover "15 or more square miles, and specify important development standards." Code § 14–13–1–2(B); *W. Bluff*, 2002–NMCA–075, ¶ 23, 132 N.M. 433, 50 P.3d 182. Rank Three Plans, or Sector Plans, cover a much smaller area with the greatest level of specificity. Code § 14–13–1–2; *W.*

*Bluff,* 2002–NMCA–075, ¶ 23, 132 N.M. 433, 50 P.3d 182. Sector Plans may "create special zoning regulations for the area covered, and may also specify other fairly detailed development parameters." Code § 14–13–1–2(C)(1); *W. Bluff,* 2002–NMCA–075, ¶ 23, 132 N.M. 433, 50 P.3d 182. The Code defines "Sector Development Plan" as follows:

A plan, at a scale of 1 inch to 200 feet, or 1 inch to 400 feet, which covers a large area satisfactory to the Planning Commission, and specifies standards for the area's and sub-area's character, allowed uses, structure height, and dwellings per acre; the plan may specify lot coverage, floor area ratio, major landscaping features, building massing, flood water management, parking, signs, provisions for maximum feasible solar access, provisions for transportation, and other such features. Such plan constitutes a detailed part of the master plan and must be essentially consistent with the more general elements of the master plan, the Albuquerque/Bernalillo County Comprehensive Plan.

Code § 14–16–1–5.

{59} Section 14–16–2–24 of the Code governs the SU–3 Special Center Zone. An SU–3 zone is described as a zone that "allows a variety of uses controlled by a plan which tailors development to an Urban Center; these include centers of employment, institutional uses, commerce, and high density dwelling." Code § 14–16–2–24. Unlike for other zones, the text of the SU–3 zone does not list permitted uses, prohibited uses, conditional uses, or the like. Instead, the text allows any use "consistent with the master plan and specified by a duly adopted Sector Development Plan," with the provision that "[s]pecifications contained in the Sector Development Plan shall control." Code § 14–16–2–24(A). An SU–3 zone was designed to be flexible; therefore, the creation of two areas, one requiring more intense uses than the surrounding area, is not inconsistent with this zone description. Thus, it was completely consistent with the Comprehensive Plan that development of suburban-type commercial establishments, such as Macaroni's, Toys–R–Us, and similar businesses, was permitted in the perimeter of the Uptown Sector; however, when such development was proposed for the center of the Sector, the City, again consistently with the Comprehensive Plan, disapproved the site development plan.

## ii. Environmental Reasons

{60} We also look to the environmental reasons relating to the creation of the intense core. In Resolution 94–1995, the resolution adopting the 95USP, the City found that the sector plan affects the entire city and that the land use and transportation planning and development will affect the safety and air-quality management of the Albuquerque metropolitan area. With regard to the 95USP's effect on air quality, the district court made the following findings: (1) that the air-quality impact assessment showed no significant differences in air pollution between the current retail trends and the proposed uses under the Revised Plan, (2) that the City's air-quality and traffic analysis showed that the only significant impact on air pollution would come from imposing stringent traffic-demand management measures on a regionwide basis, and (3) that no such regionwide measures were included in the Revised Plan. Our review of the whole record shows otherwise.

{61} At the joint meeting of the EPC and the LUPZ on May 24, 1995, the air pollution control division (division) planner reported on the air-quality impact analyses that were prepared for the 95USP. Based on evaluation of the report, the planner supported the mixed-use concept in the sector plan and felt that such land use would be the most beneficial for air quality. While the record does reflect a general assessment that there were no significant differences in air quality between the retail trends in effect at the time and the proposed sector plan uses, the planner explained that in terms of pollution levels, however, the proposed sector plan high-density uses would be "equal to or better than retail-based uses, despite having up to six times more floor area space within the central core." He also noted that "Uptown's specific travel demand management strategies, combined with the sector plan mixed uses, will produce greater air pollution reductions than the current trend retail-based

uses." According to the planner's interpretation of the data, proposed "sector plan uses will be more conducive to averting [carbon monoxide] violations than retail-based use[s]." At the May 30, 1995, LUPZ meeting, a division planner countered ACP's characterization of the data as showing no difference in air quality, based on land use. The planner explained that there will be "fewer exceedances of the carbon monoxide standards with the mixed uses" in the proposed sector plan if the plan is combined with "any amount" of transportation management strategies. Thus, the district court's finding that the only significant impact would come from stringent regionwide traffic measures is only one interpretation of the evidence, an interpretation rejected by the City.

{62} Additionally, the 95USP specifies the need for transportation management strategies as an adjunct to the mixed-use concept and contains transportation management goals related to improving air quality. The 95USP also requires new projects to have traffic mitigation plans that assess the impact of the project and outline measures that will be implemented to reduce traffic. Further, Resolution 94–1995 itself requires the establishment of a representative public-private task force to "[r]ecommend policies, standards and programs for traffic reduction and congestion management citywide that are similar to those implemented in Uptown." Therefore, contrary to the district court's findings, we find that the record demonstrates the reasonableness of the City Council's interpretation of the air-quality studies and the City Council's ultimate decision to approve the 95USP. *Tallman v. ABF (Ark. Best Freight)*, 108 N.M. 124, 129, 767 P.2d 363, 368 (Ct.App.1988) ("The possibility of drawing two inconsistent conclusions from the evidence does not mean the agency's findings are unsupported by substantial evidence."). On whole record review, a reviewing court must uphold the zoning authority's decision if that decision is supported by substantial evidence. *Paule v. Santa Fe County Bd. of County Comm'rs*, 2005–NMSC–021, ¶ 32, 138 N.M. 82, 117 P.3d 240. The reviewing court may not substitute its judgment merely because there is evidence supporting a different conclusion. *Id.*

### 4. Resolution 270–1980

{63} The district court determined that the 95USP created a new zone, subject to Resolution 270–1980; that there was no substantial evidence that the City complied with this resolution; and, further, that ACP's property was downzoned, in violation of Resolution 270–1980. The City counters, arguing that Resolution 270–1980 does not apply in this case because the 95USP was accomplished by a text amendment and text amendments are not covered by the resolution. We agree with the City.

{64} Resolution 270–1980 states the following:

ADOPTING POLICIES FOR ZONE MAP CHANGES AND SUPERSEDING CITY COUNCIL RESOLUTIONS 217–1975 AND 182–1978 RELATING TO ZONE CHANGE APPLICATIONS AND APPEALS.

WHEREAS, the usefulness of the Comprehensive City Zoning Code in implementing the City's Comprehensive Plan and promoting health, safety, morals, and general welfare is enhanced by a reasonable flexibility in order to deal reasonably with changes in the physical, economic, and sociological aspects of the city; and

WHEREAS, certain general policies for consideration of zone map changes and other zoning regulation changes should be recognized as determinative.

BE IT RESOLVED BY THE COUNCIL, THE GOVERNING BODY OF THE CITY OF ALBUQUERQUE:

Section 1. The following policies for deciding zone map change applications pursuant to the Comprehensive City Zoning Code are hereby adopted:

A. A proposed zone change must be found to be consistent with the health, safety, morals, and general welfare of the City.

B. Stability of land use and zoning is desirable; therefore, the applicant must provide a sound justification for the change. The burden is on the applicant to show why the change should be made, not

on the City to show why the change should not be made.

C. A proposed change shall not be in significant conflict with adopted elements of the Comprehensive Plan or other City master plans and amendments thereto including pr[i]vately developed area plans which have been adopted by the City.

D. The applicant must demonstrate that the existing zoning is inappropriate because

(1) there was an error when the existing zone map pattern was created, or

(2) changed neighborhood or community conditions justify the change, or

(3) a different use category is more advantageous to the community, as articulated in the Comprehensive Plan or other City master plan, even though (1) or (2) above do not apply.

E. A change of zone shall not be approved where some of the permissive uses in the zone would be harmful to adjacent property, the neighborhood or the community.

F. A proposed zone change which, to be utilized through land development, requires major and unprogrammed capital expenditures by the City may be

(1) denied due to lack of capital funds or

(2) granted with the implicit understanding that the City is not bound to provide the capital improvements on any special schedule.

G. The cost of land or other economic considerations pertaining to the applicant shall not be the determining factor for a change of zone.

H. Location on a collector or major street is not in itself sufficient justification of apartment, office, or commercial zoning.

I. A zone change request which would give a zone different from surrounding zoning to one small area, especially when only one premise is involved, is generally called a "spot zone." Such a change of zone may be approved only when

(1) the change will clearly facilitate realization of the Comprehensive Plan and any applicable adopted sector development plan or area development plan; or

(2) the area of the proposed zone change is different from surrounding land because it could function as a transition between adjacent zones; because the site is not suitable for the uses allowed in any adjacent zone due to topography, traffic, or special adverse land uses nearby; or because the nature of structures already on the premises makes the site unsuitable for the uses allowed in any adjacent zone.

J. A zone change request which would give a zone different from surrounding zoning to a strip of land along a street is generally called "strip zoning." Strip commercial zoning will be approved only where

(1) the change will clearly facilitate realization of the Comprehensive Plan and any adopted sector development plan or area development plan, and

(2) the area of the proposed zone change is different from surrounding land because it could function as a transition between adjacent zones or because the site is not suitable for the uses allowed in any adjacent zone due to traffic or special adverse land uses nearby.

Section 2. City Council Resolutions 217–1975 and 182–1978 adopting policies for zone map change applications and appeals of Environmental Planning Commission are hereby superseded.

Resolution 270–1980. Interpretation of the language of a resolution related to zoning is similar to interpretation of a zoning ordinance. Such interpretation is a matter of law, which we review de novo using the same rules of construction that apply to statutes. *Smith*, 2005–NMSC–012, ¶ 18. We begin by reviewing the "plain language" of the resolution. *High Ridge Hinkle Joint Venture v. City of Albuquerque*, 1998–NMSC–050, ¶ 5, 126 N.M. 413, 970 P.2d 599. We give words their ordinary meanings, without adding terms the enacting body did not include, unless a different intent is indicated. *Id.*

██ {65} The title of the resolution refers to the adoption of zone map changes and then indicates that the resolution is to supercede certain resolutions relating to applications and appeals. The text of the lettered subsections of Section 1 of the resolution

deals exclusively with zone change applications and sets forth what information is required and who has the burden to supply the justification for a zone change. No other type of application is mentioned in Section 1. Importantly, the wording of Section 1 indicates that the adopted policies are for deciding *"zone map change applications."* (Emphasis added.) Section 2 effectively repeals previous resolutions regarding zone map change applications and appeals to the EPC. Giving the words in this resolution their ordinary meanings, we find it clear that the main text of Resolution 270–1980 (i.e., Section 1) refers to zone map changes only and that the policies do not apply to text amendments or to amendment of sector development plans that do not involve zone map amendments, as in this case. Reading the resolution in its entirety, we also find it clear that the "other zoning regulations" in the second "whereas" clause can only refer to the repeal portion of the resolution set out in Section 2 of the resolution.

{66} The language of Resolution 270–1980 was also considered in *Hart v. City of Albuquerque*, 1999–NMCA–043, ¶¶ 19–24, 126 N.M. 753, 975 P.2d 366. This Court described the resolution as articulating "the policies for approving a zone map change." *Id.* ¶ 20. Our conclusion is further buttressed by the language contained in Section 14–16–4–1 of the Code, setting forth the amendment procedure. Zone map amendments and text amendments are treated distinctly. *See* Code § 14–16–4–1. *Compare* Code § 14–16–4–1(A)(3), which deals with zone map amendments, *with* Code § 14–16–4–1(A)(4), which deals with text amendments; *compare* Code § 14–16–4–1(C), which sets forth the procedures for hearings and decision for proposed zone map amendments, *with* Code § 14–16–4–1(D), which contains the procedures for hearing and decision for text changes. Amendment to a sector plan can be accomplished by amendment of a zone map, amendment to the text of the sector plan, or both. Code § 14–16–4–3(A)(4), (5). When the amendment to a sector plan is by text amendment only, the application is subject to the same procedures as changes to the text in the Code, as described above. Code § 14–16–4–3(A)(5).

{67} The City's application form for the amendment of an adopted plan also separates out the types of action into two categories: "application for amendment" and "type of request." The category "application for amendment" allows the applicant to indicate the type of document to be amended: (1) Comprehensive Plan, (2) area or facility plan, or (3) neighborhood, corridor, or sector plan, or (4) other. Under "type of request," there are three choices: (1) map amendment, (2) policy or text amendment, or (3) other. The planning department completed an application to revise the sector plan; on that application, the department checked the box indicating the department was submitting an amendment to revise a sector plan by text amendment, not by map amendment. The City's zoning documents contemplate amendment to the zoning code by different methods, similar to the types of rezonings categorized by Ziegler that we outlined previously in paragraph 42 herein. Accordingly, based on the language of Resolution 270–1980 and our conclusion that the revisions to the 81USP were text amendments, we reverse the district court's conclusion that the City failed to follow the provisions of this resolution.

## 5. Downzoning

### a. Generally

{68} Rezoning by map amendment or by text amendment may involve a downzoning. 3 *Rathkopf's, supra* §§ 38:2 to 38:3, at 38–3. As described in *Rathkopf's,* the term "downzoning" is used to describe a rezoning to a less intensive use; examples include reclassification from industrial to residential or, as is often the case, a reduction in permitted residential density. 3 *Rathkopf's, supra* § 38:13, at 38–10. "Downzoning" is an informal word of art that almost never appears in the statutes or ordinances. 3 *Rathkopf's, supra* § 38:12, at 38–8. In New Mexico, "downzoning" is defined as "rezoning property to a more restrictive use." *Mandel,* 119 N.M. at 688, 894 P.2d at 1044. Downzoning normally involves only a single landowner and a small piece of property. *Id.* at 688–89, 894 P.2d at 1044–45. Although the definition does not

specifically include text amendments, we look to *KOB–TV* and *Mandel,* two cases in which we evaluated the actions of a zoning authority in the context of a text amendment, to determine if a specific property had been downzoned. *KOB–TV,* 2005–NMCA–049, ¶ 27, 137 N.M. 388, 111 P.3d 708; *Mandel,* 119 N.M. at 688, 894 P.2d at 1044. In neither case did we find a downzone. *KOB–TV,* 2005–NMCA–049, ¶ 27, 137 N.M. 388, 111 P.3d 708; *Mandel,* 119 N.M. at 689, 894 P.2d at 1045.

{69} In determining that the City's revision of the Uptown Sector Plan constituted a downzoning of ACP's property, the district court determined that this case was factually similar to *Davis v. City of Albuquerque,* 98 N.M. 319, 648 P.2d 777 (1982). There, the City adopted a zoning map amendment pursuant to an amendment of the Comprehensive Plan. *Id.* at 320, 648 P.2d at 778. An eight-block area in the sector plan was downzoned from R–3 to SF, while the remaining area was allowed to continue in the same density. *Id.* at 321, 648 P.2d at 779. The Davis property, four contiguous lots on Silver SE, was included in the area that was downzoned from R–3 to SF. *Id.* at 320, 648 P.2d at 778. Our Supreme Court determined that this downzoning was subject to the "change or mistake" rule adopted in *Miller,* 89 N.M. at 506, 554 P.2d at 668, even though the zoning change was done in conjunction with a revision of the sector plan. *Davis,* 98 N.M. at 320–21, 648 P.2d at 778–79. It was clear in *Davis* that the action of the zoning authority was downzoning, as it changed the zoning designation from medium-density residential to single-family residential. *Id.* at 320, 648 P.2d at 778. Further, the Court in *Davis* determined that the rezone was unreasonable because it was inconsistent with the stated purpose of the Comprehensive Plan. *Id.* at 321, 648 P.2d at 779. The zoning change applied the restrictive zoning to a single landowner and left unaffected others who were similarly situated. *Id.* The Court acknowledged that its holding was not an attempt to limit the flexibility of a zoning authority to rezone, as long as the rezoning is reasonable, but found the facts insufficiently distinguishable from the *Miller* case to remove the *Davis* case from

the "change or mistake" rule. *Id.* The Court determined that there was, in fact, an unreasonable rezoning of a small piece of land. *Id.*

{70} In our case, there is no change to the zoning map. The zoning remains SU–3, Special Use Center, with site development approval required. The revisions affect the type of commercial uses and require high-density uses in the inner core, which were simply a quantification of what was envisioned by the 81USP and what the City would have had the right to approve or disapprove under the 81USP in any event. There is no change in the fact that any development will have to get City approval. Contrary to *Davis,* the changes here were entirely consistent with the City's master plan and its vision of an uptown urban center. Again, we look to the evidence in the record, which disclosed that after a good deal of study and reports from experts on traffic, air quality, and transportation, as well as feedback from city planners and neighborhood associations, the City made a policy decision regarding future development in the Uptown Sector. This policy decision was made in connection with a planning document whose purpose was to give more guidance to developers in the urban Uptown Sector. The policy decision was entirely consistent with the City's master plan, which designates Uptown as an urban center. These facts are different from those in *Davis* and *Miller* and support a different conclusion.

{71} The restrictions in the 95USP simply quantified and made more specific the vision that was already stated generally in writing in the Comprehensive Plan and the 81USP and delineated how that vision would specifically come to pass in future development. Further, contrary to *Davis,* the changes here apply not only to ACP but to all property owners in the intense core. Thus, ACP was not being treated differently from other similarly situated landowners in the core of the Uptown Sector. There was no downzoning here.

**b. Targeting**

{72} ACP maintains that the City targeted ACP's property and thereby effected a

downzone, requiring due process and a quasi-judicial hearing. We have already rejected, in paragraphs 36–39 herein, ACP's contention regarding the necessity for a due process quasi-judicial hearing. As to the targeting, ACP relies on *Nasierowski Brothers Investment Co. v. City of Sterling Heights,* 949 F.2d 890, 895–96 (6th Cir.1991), and on *Harris v. County of Riverside,* 904 F.2d 497, 501–03 (9th Cir.1990), which are distinguishable. In both cases, a rezoning occurred, resulting in fundamental change to the uses allowed on a landowner's property; however, in neither case had the municipality given the owner notice of the change, so the landowner had no chance to protest. The cases were reversed, based on lack of notice. In our case, ACP had notice and objected to the revisions as they worked their way to the City Council for action. In addition, there was no targeting, and there was no fundamental change.

{73} The targeting argument was also made in *KOB–TV:* the TV station asserted that it had been targeted, and it contended that the elimination of helipad use as to its property was site specific. 2005–NMCA–049, ¶ 27, 137 N.M. 388, 111 P.3d 708. We have already dealt with this argument in paragraph 39 of this opinion. As we explained in *KOB–TV,* the challenged amendment established policy for the entire city and was "not one in which a single property was rezoned to a more restrictive use." *Id.* In this case's record, there is substantial evidence that adoption of the 95USP established policy for the entire city, and our review of the record supports the conclusion that ACP was one of several landowners in the inner core that became subject to the new requirements. While we agree that there is an opposing view of the evidence on this issue, as long as there was substantial evidence on the issue, it was up to the City Council, not the reviewing court, to make the final decision. *See Paule,* 2005–NMSC–021, ¶ 32, 138 N.M. 82, 117 P.3d 240.

**6. "Change or Mistake" Rule**

█ {74} The "change or mistake" rezoning doctrine was first adopted in Maryland, then Mississippi, and has been adopted to varying degrees in a minority of states, including New Mexico. 3 *Rathkopf's, supra* §§ 42:2 to:3, at 42–3 to –5 (footnotes omitted) (listing in a footnote a number of jurisdictions in which the "change or mistake" doctrine has been adopted to varying degrees). In New Mexico, *Davis* and *Miller* stand for the proposition that anyone seeking to rezone an owner's property to a more restrictive zoning must show either that there was a mistake in the original zoning or that since the original zoning, a substantial change has occurred in the character of the neighborhood to such an extent that the reclassification or change ought to be made. *Davis,* 98 N.M. at 320, 648 P.2d at 778; *Miller,* 89 N.M. at 506, 554 P.2d at 668. Both cases dealt with rezoning by map amendment. *Davis,* 98 N.M. at 320, 648 P.2d at 778 (changing the property classification from R–3, medium- to high-residential density, to SF, single-family residential); *Miller,* 89 N.M. at 504, 554 P.2d at 666 (amending zoning classifications of R–1 and R–3 to the more restrictive classification of SU–1). In our case, the rezoning was accomplished by text amendment to a sector plan; the zoning designation remained the same.

█ {75} In *KOB–TV,* we recognized that the "change or mistake" rule does not apply to rezoning by text amendment. 2005–NMCA–049, ¶ 27, 137 N.M. 388, 111 P.3d 708 (acknowledging that the "change or mistake" rule applies when there is rezoning to a more restrictive classification but recognizing that there was no change in the zoning of KOB's property). This Court rejected KOB's claim that the city's actions amounted to a downzoning that *required a change or mistake in* the original zoning. *Id.* In paragraph 74 herein, we have already held that the City's action was not downzoning. We also hold that the "change or mistake" rule does not apply to rezoning by text amendment. This is consistent with our reading of 3 *Rathkopf's, supra* § 42:3, at 42–3 to –5, specifically footnote 3, wherein all of the cases cited relate exclusively to rezoning by map amendment. *See* 1 Williams, *supra* § 33:1, at 837 (describing the rule as applying to changes in the zoning map).

{76} Although our reliance on *KOB–TV* disposes of the issue, we explain why we decline to expand application of the rule to text amendments. First, any enlargement of the doctrine to rezoning by text amendment would be a first; currently, the "change or mistake" rule employed in other jurisdictions applies to map amendments only. *See* 3 *Rathkopf's, supra* § 42:3, at 42–3 to –5; 1 Williams, *supra* § 33:1, at 837. Second, we are concerned that the rule itself is the minority position and that it is often criticized. The rule has been described as a "clear example of a legal doctrine based upon a misunderstanding of the nature of the planning process." 1 Williams, *supra* § 33:1, at 837. The "change or mistake" rule has been almost exclusively a Maryland doctrine, with few exports to other states, and has "occasionally turned up in other states with less experience in zoning litigation." *Id.* at 838. Further, this rule has been criticized as giving the original zoning a greater presumption of correctness than the amendment and has thereby prevented the zoning authority from making zone changes, no matter how reasonable and desirable they may be. *Neuzil v. City of Iowa City,* 451 N.W.2d 159, 165 (Iowa 1990). While we recognize that the specific facts of *Miller* and *Davis* dictated the application of the "change or mistake" rule to those cases, we also observe that in *Davis,* the Court recognized the importance of allowing the zoning authority to make reasonable changes and seemed to limit the application of the "change or mistake" rule to the situation in that case. 98 N.M. at 321, 648 P.2d at 779 (stating that "a more reasonable downzone or a more reasonable comprehensive plan might be sufficient to remove the case" from application of the rule). For these reasons, we are reluctant to extend the rule.

{77} ACP cites to *West Old Town Neighborhood Ass'n* as support for the district court's application of the "change or mistake" rule. In that case, the sector development plan had established the zoning for the area covered by the plan, which included land inside and outside the city limits. *W. Old Town Neighborhood Ass'n,* 1996–NMCA–107, ¶ 4, 122 N.M. 495, 927 P.2d 529. The applicant filed an annexation petition to annex certain land into the city and also sought to amend the sector plan to allow RA–2 zoning. *Id.* The land in question had been zoned RA–1 in the sector plan. *Id.* The city approved the annexation but rezoned the annexed land to SU–1; it also amended the sector plan to permit the new SU–1 zoning on this particular property. *Id.* ¶ 6. The city's planning ordinance, however, contained a procedure to be followed when a requested zoning change was different from the zoning designation already contained in an existing sector plan; the procedure required the filing of two applications: one to amend the zoning map and another to amend the sector plan. *Id.* ¶ 16. This Court reversed the decision of the city because it failed to comply with its own requirements for zoning map and sector map amendments. *Id.* ¶ 27. Our discussion of the "change or mistake" rule was made in the context of the rule's application to a change in the zoning designation from RA–1 to SU–1. *Id.* ¶ 22. Here, as we have explained above, there is no conflict between the zoning designation in the 81USP and the 95USP; the zoning classification remains SU–3. Unlike the situation in *West Old Town Neighborhood Ass'n,* there is no requirement here that the zoning map be amended; therefore, the "change or mistake" rule is inapplicable.

## III. CONCLUSION

{78} We hold that the 1995 revisions to the Uptown Sector Plan were legislative action establishing areawide policy for the future development of the Uptown Sector. We reverse the district court's determination that the revisions downzoned ACP's property. Likewise, we reverse the district court's order remanding to the City to consider the Opus site plan under the 81USP. Therefore, the district court's later order requiring approval of the plan is reversed as a nullity. We note that even if the plan were required to be reviewed under the 81USP, the City would have discretion to deny it as inconsistent with the Comprehensive Plan. Finally, because the basis of the jury's verdict was the downzoning of ACP's property without a

quasi-judicial hearing, which resulted in multiple violations of the United States Constitution, we reverse the jury verdict.

{79} **IT IS SO ORDERED.**

WE CONCUR: MICHAEL D. BUSTAMANTE, Chief Judge, and LYNN PICKARD, Judge.

Appendix A

## UPTOWN SECTOR DEVELOPMENT PLAN
## PARCEL ZONING

**APPENDIX B**

Unlined area is inner core surrounded by Loop Road.

Appendix C

## ORDER ON MOTION FOR REHEARING

CASTILLO, Judge.

{80} In its motion for rehearing and the briefs in support of the motion, ACP raises four issues that are the subject of this order: ACP's contention that the City erred in amending the 81USP by resolution, instead of by ordinance; ACP's contention that this opinion will now allow municipalities to change zoning by words, instead of by maps; ACP's allegation that this Court misunderstood the specific zoning of the Uptown area; and ACP's position that the takings verdict should stand. We address each issue in turn.

## I. ISSUES

### A. Resolution Versus Ordinance

{81} ACP contrasts the language of Section 14–16–4–1(D) of the Code, which directs that text amendments be made by ordinance, with Section 14–16–4–1(C)(9) of the Code,

which does not require an ordinance to effect zone map amendments. ACP then contends that because the amendments to the 81USP were made by resolution and not by ordinance, the City did not follow its own procedures and, further, that use of a resolution, instead of an ordinance, evidences the City's intent to amend the 81USP by zone map amendment.

{82} While we agree that the zoning code does contemplate that amendments to the text of the code be made by ordinance, the adoption of the 95USP by resolution does not end the inquiry. A similar argument was made in *West Old Town Neighborhood Ass'n*, 1996–NMCA–107, ¶ 12, 122 N.M. 495, 927 P.2d 529. Our analysis in that case was based on the premises that when a resolution is in substance an ordinance or a permanent regulation, the name given to the resolution is immaterial, and that if it is passed with all the formality of an ordinance, the resolution thereby becomes a legislative act. Thus, it is not critical whether it be called an ordinance or a resolution. There is no argument here that the 95USP was not adopted with the same formality as that of an ordinance. There were numerous hearings on the proposed amendments to the 81USP, and the City Council finally adopted the resolution on a 7–0 vote. Consequently, we will not "violate a basic tenet of judicial review by exalting form over substance." *W. Old Town Neighborhood Ass'n*, 1996–NMCA–107, ¶ 13, 122 N.M. 495, 927 P.2d 529.

### B. Zoning by Words

{83} ACP contends that our opinion will allow municipalities to actually change zoning by the vehicle of text amendments. We disagree because we have held that the text amendment here did not actually change the zoning. We appreciate ACP's concern, but it does not apply to the facts of this case. Further, "[s]hould such a course of procedure be pursued in other cases, we will know how to deal with it." *State ex rel. Delgado v. Stanley*, 83 N.M. 626, 627, 495 P.2d 1073, 1074 (1972).

### C. Zoning in the Uptown Sector

{84} ACP characterizes the zoning in the Uptown Sector under the 81USP as "SU–3 Zone for the Uptown Metropolitan Urban Center" and maintains that this Court erroneously concluded that the zoning for this part of Uptown is the generic "SU–3 Special Center Zone." ACP misreads the opinion. In paragraph 59 of the opinion, we discussed the definition of SU–3 as set out in the Code, and we focused on the flexibility allowed by this type of zoning. The areas within the boundaries of the City are divided into basic zones, and SU–3 is one of the zones. Code § 14–16–2–1. Uses must be consistent with the master plan and may be specified by a duly adopted Sector Development Plan. Code § 14–16–2–24(A). "Specifications contained in the Sector Development Plan shall control." *Id.* ACP argues that we mistakenly considered the intense core as zoned "SU–3 Special Center Zone" without any specification of permitted uses, while the land was in fact zoned "SU–3 Zone for the Uptown Metropolitan Urban Center" with specific allowance of uses that are for the most part permissive in C–2 zones. The denomination "SU–3 Zone for the Uptown Metropolitan Urban Center" does not zone this area. It is the title of this section of the 81USP and does not affect the SU–3 zoning designation. The additional language merely indicates the location of the SU–3 Zone. We agree with ACP that the 81USP lists permitted uses in the SU–3 Zone; our points were that SU–3 zones can have different permitted uses and that this is allowed under this type of zoning designation. ACP also seems to be arguing that all permitted uses listed in the 81USP are allowed. This is not the case. Even though a use is permitted, that use as set out in a proposed site development plan might not be approved. All permissive uses are "subject to site development plan approval," and in the approval of a site development plan, requirements may be imposed "as may be necessary to implement the purpose of [the 81USP]."

### D. Takings Verdict

{85} This case was tried to a jury on alternative theories: violation of procedural

due process resulting in damages and a claim of a constitutional taking. The jury awarded damages on both claims. ACP then elected judgment on the due process violation to prevent a double recovery; judgment was entered thereon. ACP reads our opinion to reverse the due process judgment and asks this Court to clarify the effect of the opinion on the takings verdict, which ACP contends was not affected because there was evidence supporting the theory of takings involving the denial of all economically viable use of ACP property and this theory was not affected by our opinion. The City understands the opinion to reverse the takings verdict. We agree that this issue should be clarified, and we agree with the City.

{86} The parties take opposite views on the effect of ACP's electing judgment on the due process verdict. Citing to *Grogan v. Garner*, 806 F.2d 829, 839 (8th Cir.1986), ACP contends that if one verdict is lost on appeal, the judgment should be modified to substitute the other verdict. The City contends that ACP has forfeited its right to resurrect the takings verdict because a judgment of dismissal was entered on the verdict and because ACP did not appeal and thus waived the issue. Since we are reversing the takings verdict on a separate ground, we need not address the effect of the election of verdicts on this case.

{87} ACP relied on two experts to prove that the City had denied ACP all economically viable use of its property: Anne Ricker and Michael Halsey. Both experts opined that the 95USP prevented any type of development on the property that would be economically feasible for ACP. What they failed to take into account, however, was the effect of the 81USP. Ms. Ricker testified that she made no analysis as to whether the site plan "was approvable under the 1981 Sector Plan." Mr. Halsey agreed with Ms. Ricker's opinion, and his testimony contained no information about the effect of the 81USP on the site plan. The effect of our opinion has been to uphold the City's denial of the site plan under the 81USP. This fact was not considered by the experts in coming to their opinions, and their opinions were expressly based on the idea that the 95USP did

something to ACP's right to develop the property that was different from the 81USP; therefore, those opinions cannot provide the basis for the damages awarded in this case. *See Grudzina v. N.M. Youth Diagnostic & Dev. Ctr.*, 104 N.M. 576, 582, 725 P.2d 255, 261 (Ct.App.1986) (observing that "an expert's opinion is only as good as the factual basis for it"); *Niederstadt v. Ancho Rico Consol. Mines*, 88 N.M. 48, 51, 536 P.2d 1104, 1107 (Ct.App.1975) (stating that if the expert who testifies lacks pertinent information, his or her opinion cannot satisfy the burden imposed by the applicable statute). Since ACP's proposed development could not have been built under the 81USP, no damages could have resulted from similar prohibitions under the 95USP, and ACP therefore failed in its burden to prove that the 95USP effected an unconstitutional taking caused by the denial of all economically viable use of the property. Accordingly, we reverse the takings verdict.

## II. MOTIONS

{88} All motions filed after the motion for rehearing are hereby denied.

{89} **IT IS SO ORDERED.**

WE CONCUR: MICHAEL D. BUSTAMANTE, Chief Judge, and LYNN PICKARD, Judge.